*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-0182

THOMAS R. JONES, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-14717-09)

(Hon. William M. Jackson, Trial Judge)

(Argued April 29, 2015                    Decided July 9, 2015)

*Lisa D. Chanel*, appointed by the court, for appellant.

*David B. Goodhand*, Assistant United States Attorney, with whom *Ronald C. Machen Jr.*, United States Attorney at the time the brief was filed, and *Elizabeth Trosman*, *Suzanne Grealy Curt*, and *Jeff Pearlman*, Assistant United States Attorneys, were on the brief, for appellee.

Before FISHER, *Associate Judge*, NEBEKER, *Senior Judge*, and KRAVITZ, *Associate Judge, Superior Court of the District of Columbia.*[*]

KRAVITZ, *Associate Judge*:  Appellant Thomas R. Jones was tried before a Superior Court jury in March 2011 on charges of first-degree premeditated murder while armed, assault with intent to kill while armed, aggravated assault while

---

[*] Sitting by designation pursuant to D.C. Code § 11-707 (a) (2012 Repl.).

armed, possession of a firearm during a crime of violence, carrying a pistol without a license in a gun-free zone, and possession of a firearm by a convicted felon. The charges arose from an incident on the night of July 3-4, 2009 in which two men were shot, one fatally, inside a passenger van parked in the 4400 block of Ord Street, N.E., in the District of Columbia. The jury returned a partial verdict at the end of the trial, acquitting appellant of first-degree premeditated murder while armed and convicting him of carrying a pistol without a license in a gun-free zone and possession of a firearm by a convicted felon. The jury was unable to reach unanimous decisions on the other charges, including the lesser-included offense of second-degree murder while armed, and the trial judge declared a mistrial on the unresolved charges and later dismissed them on the government's motion. At sentencing, the judge imposed concurrent terms of imprisonment of eight years for carrying a pistol without a license in a gun-free zone and twelve years for possession of a firearm by a convicted felon. This timely appeal followed.

Appellant argues that the trial judge erred by (1) admitting evidence of his prior possession of a "Bulldog" revolver, one of two types of pistols capable of firing the bullets recovered from the decedent's body; (2) denying his request for a mistrial or a continuance following the government's mid-trial disclosure of information relating to a potentially exculpatory witness; (3) inviting the jury to

return a partial verdict without a sufficient indication that the jury had decided any of the charges; (4) failing to give the jury a special unanimity instruction on the charges of carrying a pistol without a license in a gun-free zone and possession of a firearm by a convicted felon; (5) imposing unreasonable limits on the jurors' responses to questions posed during a poll of the jury; (6) denying his motion for a judgment of acquittal on the charges of carrying a pistol without a license in a gun-free zone and possession of a firearm by a convicted felon; (7) failing to instruct the jury on an essential element of the offense of carrying a pistol without a license in a gun-free zone; and (8) imposing illegal sentences for carrying a pistol without a license in a gun-free zone and possession of a firearm by a convicted felon.[1]

We agree that the twelve-year prison term imposed for possession of a firearm by a convicted felon was illegal in that it exceeded the maximum sentence allowed by law at the time appellant committed the offense. We therefore vacate appellant's sentence on that charge and remand for resentencing within applicable statutory limits. We otherwise affirm appellant's convictions.

---

[1] In a pro se brief appended to his counsel's initial brief on appeal, appellant argues further that the trial judge erred by summarily denying his motion for post-conviction relief under D.C. Code § 23-110 (2012 Repl.). This claim of error is not properly before us. It is not encompassed by the notice of appellant's direct appeal from the judgment of conviction, and the record reflects that a separate notice of appeal, from the denial of appellant's § 23-110 motion, was mailed to the trial judge's chambers but never docketed by the Clerk of the Superior Court.

## I.   FACTS

We will outline here the essential facts and circumstances relating to the events of July 3-4, 2009.  To the extent additional facts and circumstances are necessary to our analyses of appellant's contentions on appeal, we will include them within our discussions below.

Appellant Thomas R. Jones called his friend Jeffrey Stuckey on the night of July 3, 2009 and asked for a ride to Mr. Stuckey's house.  Appellant and Mr. Stuckey had grown up together and were very close.  Mr. Stuckey picked up appellant and brought him over to 4401 Ord Street, N.E., where Mr. Stuckey lived with his girlfriend, Shaunice Frazier; Ms. Frazier's 13-year-old son, Antonio Frazier; and Ms. Frazier's adult godson, Lee'ante Brown.  Those three, as well as several other adults and children, were at the house when appellant and Mr. Stuckey arrived.

Appellant, Mr. Stuckey, Mr. Brown, and others went to the basement to shoot dice and drink liquor.  Some of the adults, including Mr. Stuckey, also

smoked marijuana and took ecstasy. Antonio Frazier and the other children were allowed to remain in the basement despite the nature of the activities.

Several of the people present in the basement testified that appellant had a gun on his person. Shaunice Frazier told the jury she saw the butt of a gun protruding from appellant's jacket pocket as appellant kneeled down to shoot dice. Antonio Frazier and Mr. Stuckey testified that at one point the gun fell out of appellant's pocket onto the floor. Mr. Stuckey stated that this made him concerned for the safety of the children in the basement and that he told appellant to put the gun back in his pocket. Appellant did as he was told, albeit not before Mr. Stuckey recognized the gun as a .44 caliber "Bulldog" revolver he had seen in appellant's possession on previous occasions.

Later the same night, appellant's brother, Calvin Jones, called appellant and proposed an outing to a strip club. (To avoid confusion, we will refer to Calvin Jones primarily as "Mr. Jones" or "appellant's brother.") Like appellant, Mr. Jones had grown up with Mr. Stuckey and was very close to him. Appellant agreed to the plan, and Mr. Jones and another friend, Andre Smith, rode over in Mr. Jones's van to the Ord Street house, where they picked up appellant, Mr. Stuckey, and Mr. Brown.

The men went first to a nearby gas station to buy cigars on their way to the strip club. Mr. Smith drove the van, while Mr. Stuckey sat in the front passenger seat and Mr. Jones was seated in the second row directly behind Mr. Smith. Appellant and Mr. Brown sat in seats in the second and third rows, although their precise seating locations were the subject of conflicting testimony at trial.

At some point, appellant and Mr. Stuckey got into a heated argument inside the van. Mr. Stuckey chided appellant and swore at him, causing appellant to become increasingly angry. As the argument escalated, Mr. Stuckey said he no longer wanted to go to the strip club, and the men drove back to the house on Ord Street.

Shots rang out inside the van once the van came to a stop in front of 4401 Ord Street. One of the shots hit Mr. Stuckey in the left side of his neck. Mr. Stuckey testified that he did not see anyone fire a gun inside the van, but he said he believed appellant was the shooter. Mr. Stuckey jumped out of the van and ran into the house, telling Shaunice Frazier as he entered that "Tom [appellant] just shot me."

Mr. Jones and Mr. Smith testified that they did not actually see anyone fire the shots inside the van, either. Both men told the jury, however, that they saw a gun in appellant's hand after the shots were fired. Mr. Jones testified that he saw a chrome revolver in appellant's hand immediately after the shots rang out and Mr. Stuckey left the van, and he said he yelled at appellant to get out of the van as soon as he saw the gun. Mr. Smith testified that he saw a chrome gun in appellant's hand as appellant then left the van and ran off into the neighborhood.

Once appellant was out of the van, Mr. Brown stated that he, too, had been shot, and Mr. Smith and Mr. Jones drove him in the van to a nearby hospital. When they arrived at the hospital, however, Mr. Smith and Mr. Jones decided not to bring Mr. Brown inside because they were aware of an outstanding warrant for Mr. Jones's arrest and did not want to come in contact with the police. Instead, Mr. Jones and Mr. Smith left Mr. Brown in the hospital parking lot, where Mr. Brown bled to death from one of the gunshot wounds he suffered in the van outside the Ord Street house – a shot that entered Mr. Brown's thigh and severed his ileac artery. Security guards found Mr. Brown's body in the parking lot in the early morning hours of July 4, 2009.

The medical examiner recovered a .44 caliber bullet and a nickel-plated bullet fragment from Mr. Brown's body during an autopsy. A firearms expert testified that both items were fired from the same gun – either a .44 Special marketed by Charter Arms (with the moniker "Bulldog" imprinted on the side of its chrome handle) or a .44 Magnum marketed by U.S. Arms Corporation.

No other physical or forensic evidence tied appellant to the shootings. The police did not recover the gun used in the incident, and the bullet that hit Mr. Stuckey in the neck remained lodged in Mr. Stuckey's shoulder at the time of trial and was not the subject of ballistics testing. Mr. Jones, moreover, cleaned all of the blood from the interior of the van before the police could search the vehicle for evidence.

The parties stipulated that the distance between a set of trees in front of 4401 Ord Street, N.E. and Kenilworth Elementary School, located at 44th and Ord Streets, N.E., was less than 200 feet and that a school custodian, if called as a witness, would testify that for several years, including the dates July 3-4, 2009, there was a sign posted on the school's grounds prohibiting the possession of illegal firearms within 500 feet. The parties stipulated further that as of July 3-4,

2009, appellant had a prior felony conviction and did not have a license to carry a pistol in the District of Columbia.

Appellant defended against the charges by challenging the credibility of the government's witnesses and suggesting that his brother, Mr. Jones, was the real shooter. He impeached the government's witnesses with lies and inconsistencies in their statements to the police and grand jury and with evidence of their prior convictions, criminal activities, and motives to curry favor with the government. He exposed the witnesses' alcohol and drug use in the hours before the shootings and raised questions about the plausibility of the government's version of events, given the location of several bullet holes found in the van's interior, conflicts in the testimony concerning the seating arrangement inside the van, and expert medical testimony about the trajectories of the gunshot wounds suffered by Mr. Brown and Mr. Stuckey. Finally, he emphasized his brother's efforts to avoid contact with the police on the night of the shootings and to destroy critical evidence of the van's link to the crime, and he elicited testimony that his brother punched Mr. Brown in the face during a fight over alcohol sometime before the night of July 3-4, 2009.

As indicated, the jury found appellant guilty of carrying a pistol without a license in a gun-free zone and possession of a firearm by a convicted felon and

acquitted him of the first-degree premeditated murder while armed of Mr. Brown. The jury was unable to reach unanimous decisions on any of the other charges, resulting in a mistrial on the lesser-included offense of second-degree murder while armed of Mr. Brown, the charges of assault with intent to kill while armed and aggravated assault while armed of Mr. Stuckey, and three counts of possession of a firearm during a crime of violence relating to the charges of murder, assault with intent to kill, and aggravated assault. With the subsequent dismissal of the charges left unresolved by the jury, the only matters before us on appeal are appellant's convictions for carrying a pistol without a license in a gun-free zone and possession of a firearm by a convicted felon.

## II. ANALYSIS

### A. Evidence of Prior Gun Possession

The prosecutor notified appellant's lawyers by letter five days before trial that the government intended to present evidence of appellant's possession of a gun on at least three occasions in the year leading up to the shootings on July 3-4, 2009. The prosecutor stated in the letter that Mr. Stuckey had previously described the gun he saw fall out of appellant's pocket on the night of the shootings as a .44

caliber Bulldog revolver. The prosecutor stated further that when he asked Mr. Stuckey at a witness conference how he knew the gun was a Bulldog revolver, Mr. Stuckey said he had seen appellant carrying the gun at least three times in the year before the shootings and, on one of those occasions, had been close enough to the gun to see the model name "Bulldog" stamped into the metal.

Neither party filed a written motion *in limine* addressing the admissibility of the evidence outlined in the prosecutor's letter. During a discussion of preliminary matters on the first day of trial, however, the prosecutor advised the judge that he intended to elicit testimony from Mr. Stuckey regarding three or four occasions in the "several months" leading up to the shootings on which Mr. Stuckey observed appellant carrying a Bulldog revolver, including one occasion on which Mr. Stuckey actually touched the gun and saw the name "Bulldog" stamped on it. The prosecutor proffered that he had learned the information directly from Mr. Stuckey on the day he sent the letter to appellant's lawyers, and he explained that the testimony was important to the government's proof of appellant's involvement in the shootings because a firearms expert would testify that bullets recovered from Mr. Brown's body were fired from a single weapon, either a .44 caliber Charter Arms Bulldog revolver or a .44 caliber U.S. Arms Magnum revolver. The prosecutor stated further that Mr. Stuckey's testimony about the prior incidents

would enable the jury to understand how Mr. Stuckey knew the gun he saw in appellant's possession on the night of the shootings was a .44 caliber Bulldog revolver.

Appellant objected to the admission of the evidence, arguing that the government's disclosure of the proffered testimony was untimely and that the alleged incidents of prior possession of the weapon were too remote in time to be relevant. The trial judge overruled appellant's objection. The judge explained that appellant was charged with murder and carrying a gun and that the probative value of the evidence of appellant's prior possession of a Bulldog revolver outweighed any risk of unfair prejudice to him.

At trial, Mr. Stuckey testified on direct examination that a ".44 Bulldog" fell out of appellant's jacket pocket in the basement of Mr. Stuckey's home prior to the shootings on the night of July 3-4, 2009. Asked by the prosecutor how he knew it was a .44 Bulldog, Mr. Stuckey stated that he had seen appellant carrying the gun three times before the night of the shootings and that on one of those occasions he had actually held the gun in his own hands and seen the name Bulldog "branded on the gun." The prosecutor, however, never asked Mr. Stuckey when the prior incidents occurred, and Mr. Stuckey said nothing to place any of them in time.

Appellant's lawyer asked no questions about the prior incidents on cross-examination of Mr. Stuckey and made no further objection at trial to the testimony about them.

Appellant now contends that the trial judge erred in admitting Mr. Stuckey's testimony about the incidents of prior gun possession because the government's disclosure of the evidence was untimely, the earlier incidents were too temporally remote, the testimony actually presented at trial did not support the prosecutor's pretrial proffer, the judge failed to give the jury a proper limiting instruction, and the probative value of the evidence was substantially outweighed by its unfair prejudicial effect. We find no reversible error.

It has long been the rule in this jurisdiction that evidence of a defendant's uncharged criminal conduct is inadmissible to prove the defendant's disposition to commit an offense charged in the case. *See Drew v. United States*, 331 F.2d 85, 89 (D.C. Cir. 1964). Under *Drew*, evidence of other crimes committed by a defendant is admissible only if it is offered to prove a legitimate and materially disputed issue, such as motive, intent, common plan, identity, or absence of mistake or accident, *Williams v. United States*, 106 A.3d 1063, 1067 (D.C. 2015), and only if the trial judge finds by clear and convincing evidence that the defendant committed

the other crimes, *Roper v. United States*, 564 A.2d 726, 731 (D.C. 1989), and determines that the probative value of the evidence is not substantially outweighed by the risk of unfair prejudice posed by its admission, *Williams*, 106 A.3d at 1067.

The *Drew* rule, however, applies only to evidence of uncharged criminal conduct that is independent of the offense charged in the case. *Johnson v. United States*, 683 A.2d 1087, 1090 (D.C. 1996) (en banc). The strictures of *Drew*, therefore, are inapplicable to evidence of the defendant's other criminal conduct that "(1) is direct and substantial proof of the charged crime, (2) is closely intertwined with the evidence of the charged crime, or (3) is necessary to place the charged crime in an understandable context." *Id.* at 1098.

We have repeatedly recognized, moreover, that evidence of a defendant's prior possession of the weapon or type of weapon used to commit a charged offense can be admitted as direct and substantial proof of the crime charged. *See, e.g.*, *Daniels v. United States*, 2 A.3d 250, 254, 262 (D.C. 2010) (upholding the admission of testimony in a murder case that the defendant had been seen many times with a black or silver gun, where other testimony established that the murder weapon was black or silver); *Coleman v. United States*, 379 A.2d 710, 712 (D.C. 1977) ("An accused person's prior possession of the physical means of committing

the crime [charged] is some evidence of the probability of his guilt, and is therefore admissible."); *see generally Johnson*, 683 A.2d at 1097 ("Our cases have repeatedly held that admissibility of this kind of evidence [possession of pistol allegedly used in assault with intent to kill] is based upon a determination of whether it was directly relevant to some issue in the case. We have never held, and do not do so now, that such evidence must meet the standards established by the *Drew* line of cases.") (alteration in original) (quoting *King v. United States*, 618 A.2d 727, 730 (D.C. 1993)).

Ultimately, the admissibility of evidence of a defendant's prior possession of the weapon or type of weapon used in a charged offense turns on a consideration of the temporal proximity of the incidents of prior possession to the charged offense and a comparison of the appearance of the weapon previously possessed by the defendant with that of the weapon actually used in the charged offense. *Williams*, 106 A.3d at 1069. These factors inform the trial judge's determination of the relevance of the evidence and drive the requisite balancing of the evidence's legitimate probative value and the risk of unfair prejudice posed by its admission; the more likely it is that the weapon previously in the defendant's possession was the weapon used in the charged offense, the "less relevant" is the length of time

between the earlier sightings and the crime charged. *McConnaughey v. United States*, 804 A.2d 334, 339 (D.C. 2002).

A trial judge has broad discretion to determine the admissibility of evidence of uncharged misconduct as direct and substantial proof of the crime charged under *Johnson*, and on appeal our review of a judge's ruling admitting such evidence is limited to a consideration of whether there has been an abuse of discretion. *Busey v. United States*, 747 A.2d 1153, 1165 (D.C. 2000). We find no abuse of discretion in the judge's decision to admit Mr. Stuckey's testimony based on the prosecutor's pretrial proffer.

First, the government did not run afoul of any pretrial disclosure obligation. We have never determined whether the government must provide pretrial notice of its intention to present evidence of a defendant's uncharged criminal conduct as direct and substantial proof of the crime charged under *Johnson*. In *Johnson* itself, we considered whether, in the *Drew* context, we should adopt a provision of Rule 404 (b) of the Federal Rules of Evidence that requires prosecutors in federal cases to provide advance notice of the government's intent to present evidence of other crimes at trial. 683 A.2d at 1100 n.17. We declined to impose an across-the-board notice requirement for the government's intent to introduce *Drew* evidence,

although we acknowledged that "even without a rule or policy requiring such notice, the trial court has the discretion to require parties to disclose in advance their intention[s] to use evidence of other crimes, and in any event a prosecutor may find it prudent to afford such notice." *Id*. We understand that many Superior Court judges generally require the pretrial disclosure of other crimes evidence and that the government routinely discloses its intention to present such evidence even without a judge's order. Advance disclosure has many benefits – it notifies the defense of allegations of uncharged criminal conduct the defense must investigate and prepare to confront at trial; it informs the judge of often-difficult evidentiary rulings the judge may have to make at trial; and, as we stated in *Johnson*, it "may obviate any possible claim of unfair surprise and may avoid a request for [a] continuance." *Id*.

We need not decide, however, whether the government always has an obligation to disclose *Johnson* evidence in advance of trial, because even if we were to assume the existence of such an obligation, the record reflects that the prosecutor notified appellant's lawyers of his intent to present evidence of the prior incidents of gun possession on the day the prosecutor learned of the incidents from Mr. Stuckey. On this record, there can be no argument that the government's disclosure was untimely.

Second, the prosecutor's pretrial proffer amply supported the trial judge's determination that evidence of appellant's prior possession of a .44 caliber Bulldog revolver had significant legitimate probative value despite the temporal remoteness of the earlier incidents. As the prosecutor explained to the judge, ballistics evidence would show that a .44 caliber Bulldog revolver was one of only two types of guns that could have been used in the shootings on July 3-4, 2009, and Mr. Stuckey's testimony would clearly link appellant with a .44 caliber Bulldog revolver. Given the likelihood that the gun previously seen in appellant's possession was of the same distinctive type used in the charged offenses, it was less concerning that the prior sightings may have occurred several months, or even a year, before the charged offenses. *See McConnaughey*, 804 A.2d at 338-39 (upholding the admission of testimony relating to the defendant's possession of a gun eleven months before the charged offense "in light of the evidence strongly suggesting that the gun [seen previously in the defendant's possession] was the gun with which [the victims] were shot"); *(Phillip) Johnson v. United States*, 701 A.2d 1085, 1092 (D.C. 1997) (more than one year before the charged offense); *Coleman*, 379 A.2d at 712 (five months before).

We readily conclude, moreover, that the trial judge did not abuse his discretion in determining that the probative value of the proffered testimony was greater than (and thus not substantially outweighed by) the risk of unfair prejudice to appellant. The judge understood that the evidence would explain how Mr. Stuckey knew the type of gun that fell out of appellant's pocket on the night of the shootings, and it was apparent from the prosecutor's proffer that the testimony could be elicited in front of the jury with a few simple questions of Mr. Stuckey.

More complex is the question whether the trial judge erred in not striking Mr. Stuckey's testimony about appellant's prior possession of a Bulldog revolver when the government failed at trial to elicit any testimony to establish the dates on which the prior incidents occurred. Absent evidence of temporal proximity to the charged offenses, appellant argues, Mr. Stuckey's testimony about the prior acts of possession was virtually irrelevant, and any limited probative value of the evidence was substantially outweighed by its unfair prejudicial effect.

We agree that the testimony from Mr. Stuckey actually presented at trial did not fully support the prosecutor's pretrial proffer and that without any indication of temporal proximity the admissibility of the evidence of appellant's prior acts of possession of a Bulldog revolver would have been unlikely. Had appellant

objected at trial on this ground, therefore, the judge would have been required to strike the testimony or to provide some other appropriate remedy for the government's failure of proof. *See Anderson v. United States*, 857 A.2d 451, 458 n.6 (D.C. 2004); *Daniels v. United States*, 613 A.2d 342, 347 (D.C. 1992).

Appellant, however, raised no objection at trial to the incompleteness of Mr. Stuckey's testimony about the prior acts of gun possession, and he never asked the trial judge to strike the testimony or to take any other corrective action. We held in *Anderson*, 857 A.2d at 458-59, that the plain error rule applies on appeal when a defendant failed to object at trial to the admission, under *Drew*, of other crimes evidence on the ground that the evidence actually presented to the jury did not fulfill the prosecutor's pretrial proffer, even if the defendant objected before trial to the admission of the evidence. We explained that the "continuing objection doctrine only applies where the trial court 'has already had an opportunity to decide the point at issue' while 'the purpose of the contemporaneous objection rule is to give the trial court an opportunity to correct any potential errors at the time they are made.'" *Id.* (quoting *McGrier v. United States*, 597 A.2d 36, 45 n.14 (D.C. 1991)). Therefore, "[w]here a trial court permits the admission of evidence subject to the fulfillment of a condition, an opposing party must object if it believes that condition has not been fulfilled when the disputed evidence is

presented." *Id.* at 459; *see also Huddleston v. United States*, 485 U.S. 681, 690 n.7 (1988) ("It is, of course, not the responsibility of the judge sua sponte to insure that the foundation evidence is offered; the objector must move to strike the evidence if at the close of the trial the offeror has failed to satisfy the condition.").

We have never decided whether the same rule of appellate review applies in the *Johnson* context, but we see no meaningful distinction between the two situations and can think of no good reason why a defendant should be excused from interposing a contemporaneous objection when evidence of his uncharged misconduct admitted conditionally under *Johnson* fails to fulfill the prosecutor's proffer. We thus limit to plain error analysis our review of the trial judge's failure sua sponte to strike Mr. Stuckey's testimony about the incidents of appellant's prior possession of a .44 caliber Bulldog revolver.

Under the plain error doctrine, appellant must establish (1) that the trial judge committed error; (2) that the error was plain, *i.e.*, clear or obvious; (3) that the error affected his substantial rights; and (4) that a failure to correct the error would seriously affect the fairness, integrity, or public reputation of judicial proceedings. *Marshall v. United States*, 15 A.3d 699, 710 (D.C. 2011) (citing *United States v. Olano*, 507 U.S. 725, 732-36 (1993)).

Appellant has not made the requisite showing. Even if it should have been clear to the trial judge that the evidence of appellant's prior possession of the Bulldog revolver lacked probative value without testimony placing it in temporal proximity to the charged offenses, appellant cannot establish that the judge's failure to strike the testimony affected his substantial rights or that our failure to correct the error on appeal would seriously affect the fairness, integrity, or public reputation of judicial proceedings. Mr. Stuckey's testimony about the defendant's prior acts of possession covers less than a page in the transcript of a week-long trial, and without the evidence of temporal proximity proffered by the prosecutor the testimony was likely less compelling to the jury in any event. Indeed, the fact that appellant's trial counsel chose not to raise the government's failure to fulfill its pretrial proffer suggests to us that counsel reasonably viewed the government's failure more as a benign oversight than as a point of unfair prejudice.

Finally, appellant complains that the trial judge did not give an instruction limiting the jury's consideration of the evidence of his prior gun possession to its proper purpose. A limiting instruction is generally required when evidence of other crimes is admitted under *Drew*. *Jones v. United States*, 477 A.2d 231, 243 (D.C. 1984). An instruction is not always required, however, when evidence of

uncharged criminal conduct is admitted under *Johnson* as direct and substantial proof of the defendant's guilt of the charged offense; in that circumstance, it is left to the sound discretion of the trial judge to decide whether to grant a request for an instruction, even though a cautionary directive is usually warranted. *Johnson*, 683 A.2d at 1097 n.10.

Appellant never asked the trial judge to give an instruction limiting the jury's consideration of the evidence of his prior possession of the Bulldog revolver. His complaint about the judge's failure to give a cautionary instruction is therefore subject to plain error review on appeal. Given the *Johnson* rule that limiting instructions are not always required when evidence of uncharged criminal conduct is admitted as direct and substantial proof of the defendant's guilt of the charged offense, we find no error, and certainly no plain error, in the judge's failure sua sponte to give a limiting instruction.

**B. Request for Mistrial or Mid-Trial Continuance**

At the end of the first full day of trial, on Wednesday, March 9, 2011, Mr. Stuckey told the prosecutor he had received a telephone call earlier in the day from a person named "Teddy" who said he had "heard from this guy Finny[man] . . .

that maybe . . . [Calvin Jones] had something to do with Lee'ante [Brown] being killed." When the prosecutor asked Mr. Stuckey "how it is that Finny[man] would know something about this," Mr. Stuckey said he did not know but would try to talk further with Teddy.

The prosecutor reported his conversation with Mr. Stuckey to appellant's counsel on the evening of March 9, 2011. The next morning, Thursday, March 10, 2011, appellant's counsel raised the issue with the trial judge and moved for a mistrial, stating that she needed time to investigate the information provided by Mr. Stuckey. The trial judge denied the motion, but he stated that appellant's counsel should be given an opportunity to investigate the information while the trial proceeded, and he directed the prosecutor to make Mr. Stuckey available to appellant's counsel for an interview. The prosecutor agreed to arrange a meeting between appellant's counsel and Mr. Stuckey and to defer calling Mr. Jones and Mr. Smith as witnesses until appellant's counsel had at least had a chance to speak with Mr. Stuckey. The prosecutor called other witnesses in what became an abbreviated trial session on March 10, 2011, and the judge recessed the trial until the following Monday.

Appellant's counsel renewed her motion for a mistrial when the trial reconvened on Monday, March 14, 2011. Counsel reported that in the previous four days she had made considerable efforts to locate Teddy – interviewing Mr. Stuckey twice, obtaining Mr. Stuckey's telephone records and calling every number listed in them, and going to two locations where Mr. Stuckey said Teddy hung out – all to no avail. Counsel stated further that she had no leads on locating or even identifying the person known as "Finnyman"; her investigators had not found anyone who knew the man, and Mr. Stuckey did not know the man's real name. Appellant's counsel told the judge, however, that Mr. Stuckey said he would likely see Teddy within the next two days and would try to get Teddy's telephone number at that time. Asserting that it was critical to appellant's defense, counsel asked for a mistrial or, at a minimum, a few additional days to investigate the matter further.

The trial judge declined to grant either a mistrial or a further delay of the trial. The judge noted that "we know nothing about Teddy or his reliability or his motivation in calling Mr. Stuckey" and that "we know absolutely nothing about" Finnyman or "his reliability, the source of his information and whether or not this is anything beyond street rumor." The judge concluded that the risk of losing jurors, who were told during the jury selection process that the trial would last only

a week, was too great to justify an additional delay beyond the extended weekend recess already provided.

Appellant contends that the trial judge committed reversible error in denying his mid-trial request for a mistrial or a continuance. We disagree.

A trial judge's denial of a request for a mid-trial continuance to secure a witness is reviewed on appeal for abuse of discretion. *Daley v. United States*, 739 A.2d 814, 817 (D.C. 1999). Factors to be considered in determining whether an abuse of discretion occurred include the probative value of the absent witness's proffered testimony, the likelihood the witness would have appeared had the continuance been granted, the diligence and good faith of the party seeking the continuance, the prejudice resulting from the denial of the continuance, any prejudice the opposing party would have suffered had the continuance been granted, and the duration of the requested continuance and any likely resulting disruption or delay of the trial. *Gilliam v. United States*, 80 A.3d 192, 202 (D.C. 2013). At a minimum, a party seeking a continuance to obtain the attendance of a witness must show "(1) who the missing witness is, (2) what the witness'[s] testimony would be, (3) the relevance and competence of that testimony, (4) that the witness could probably be obtained if the continuance were granted, and (5)

that the party seeking the continuance has exercised due diligence in trying to locate the witness." *Daley*, 739 A.2d at 817 (quoting *Bedney v. United States*, 684 A.2d 759, 766 (D.C. 1996)).

Appellant and his counsel certainly acted diligently in investigating the information disclosed by the prosecutor. Despite their best efforts, however, appellant and his counsel were unable to provide Finnyman's real name, establish the basis of his knowledge of the shootings, or make a proffer of what he might say if located and called as a witness. Appellant thus failed to satisfy the minimum showing required for a mid-trial continuance and provided no ground on which the trial judge could have found Finnyman's testimony relevant and competent or concluded that the denial of the request would be prejudicial to appellant. The trial judge nonetheless directed the prosecutor to make Mr. Stuckey available for a defense interview, recessed the trial over an extended weekend, and agreed to the re-ordering of the government's witnesses to protect appellant's ability to cross-examine Mr. Jones and Mr. Smith with information obtained through his counsel's investigation. When those efforts failed to produce anything showing Finnyman's alleged statement to be other than an unreliable street rumor, the judge reasonably concluded that any further delay of the trial, with its attendant risk of losing jurors, was not warranted in the circumstances. We find no abuse of discretion.

## C. Partial Verdict

At the end of the trial, the judge instructed the jury on all of the charges in the indictment, as well as on the lesser-included offense of second-degree murder while armed of Mr. Brown. The jury then began to deliberate at approximately 10:00 a.m. on Wednesday, March 16, 2011. The jury deliberated throughout the remainder of that day, sending notes to the judge only to request a written copy of the parties' stipulations, a marker for the whiteboard, and the password for the computer in the jury room.

The jury resumed its deliberations on the morning of Thursday, March 17, 2011. At approximately 11:00 a.m. on that second day of deliberations, the jury sent the following note to the judge:

> Your Honor, for some of the greater offenses, individuals on both sides are very firm in their decision and have expressed that any more continued deliberations would not change their minds based on the evidence before them. We have two questions: (1) At what point are we considered a hung jury? (2) Are we allowed to consider the lesser offenses before making a unanimous decision on the greater offenses?

The trial judge discussed the jury's note with the parties. The prosecutor asked the judge to instruct the jury to continue its deliberations, while appellant requested an anti-deadlock instruction. *See Winters v. United States*, 317 A.2d 530 (D.C. 1974). The judge considered the parties' positions and sent a hand-written note to the jury, stating: "I have spoken to both sides in this matter and I'm instructing you to continue with your deliberations. You might consider going to lunch at this time."

The jury sent another note to the judge a few hours later. The note, received at 2:40 p.m. on March 17, 2011, stated:

> Your Honor, we have continued to deliberate. We continue to be a hung jury on multiple counts. There seems to be no more to discuss.

By then, the judge was selecting a jury in another trial, and he was unable to meet with the parties to discuss the jury's note until 4:00 p.m. Appellant moved for a mistrial at that time, asserting, through counsel, that "the tone of the note is very sad and very certain." The prosecutor objected to a mistrial and requested that the judge instead ask the jury whether it had reached a verdict on any counts. The prosecutor argued that portions of the jury's notes suggested that the jury may

have reached unanimous decisions on some of the charges. The judge asked the parties whether either was requesting that he take a partial verdict. The prosecutor said yes, while appellant said no and reiterated his request for a mistrial.

The judge declined to grant a mistrial, concluding that he should ask the jury whether it had decided any of the charges. He sent another written note to the jury, stating: "Ladies & Gentlemen of the jury: Has the jury reached a verdict with respect to any of the counts? If so, which counts?" The jury promptly responded with a note indicating that it had reached a verdict on three counts: "The jury has reached a verdict on the following counts: Count 1: First degree murder while armed. Count 7: carrying a pistol w/o a license. Count 8: possession of firearm by a convicted felon."

The judge then directed the courtroom clerk to escort the jury back into the courtroom, where the jury's foreperson announced verdicts of not guilty on the charge of first-degree premeditated murder while armed and guilty on the charges of carrying a pistol without a license in a gun-free zone and possession of a firearm by a convicted felon. Following a poll of the jury (discussed below), the judge excused the jurors for the day and asked them to return the next morning, Friday, March 18, 2011, to resume their deliberations on the remaining charges. (The

jury's subsequent deliberations on March 18, 2011 were not fruitful. The jury sent two more hung notes, one before and one after the judge gave an anti-deadlock instruction, and the judge declared a mistrial on all charges other than the three decided on March 17, 2011.)

Appellant argues that the trial judge improperly invited a partial verdict from the jury on March 17, 2011 without a sufficient indication that the jury had reached a unanimous decision on any of the counts before it. We are not persuaded.

Court rules provide that a jury may return a partial verdict "at any time during its deliberations." Super. Ct. Crim. R. 31 (b). "Ordinarily, therefore, a partial verdict should be accepted when it is offered unless there exists good reason to do otherwise." *Wilson v. United States*, 922 A.2d 1192, 1195 (D.C. 2007). A trial judge nonetheless treads a "fine line . . . with respect to partial verdicts" and "must be careful not to coerce juries into reaching decisions," "particularly where the jury has given no indication of agreement on any charge." *Speaks v. United States*, 617 A.2d 942, 952 (D.C. 1992).

We review a trial judge's decision to accept a partial verdict for abuse of discretion, *Wilson*, 922 A.2d at 1195, and we find no abuse here. The jury's notes

leading up to the trial judge's decision to inquire about the existence of a partial verdict strongly suggested the possibility that the jury had reached unanimous decisions on some but not all of the charges. The note at 11:00 a.m. on March 17, 2011 stated that the jurors were split on "some of the greater offenses" and asked whether the jury was permitted to "consider the lesser offenses before making a unanimous decision on the greater offenses." The note a few hours later, at 2:40 p.m., added that "[w]e continue to be a hung jury on multiple counts." Neither note said anything to indicate or imply an impasse on "all" of the charges, and since second-degree murder while armed was the only lesser-included offense on which the jury had been instructed, the references in the earlier note to a deadlock on "some of the greater offenses" and to an interest in considering the "lesser offenses" raised the likelihood that the jurors were split on some or all of the lead charges in the case – murder, assault with intent to kill, and aggravated assault – but could have reached agreement on at least some of the "lesser" weapons offenses. The statement in the later note that the jury continued to be hung on "multiple" (but not "all") counts added further support for the judge's view that the jury might have reached a partial verdict.

The trial judge thus reasonably concluded that the jury's notes indicated the possibility of unanimous agreement on some of the charges. The judge's return

note to the jurors asking whether they had reached a verdict on any of the charges, moreover, was plainly worded and appropriately understated so as to avoid any sense of coercion among the jurors. We are satisfied that the judge successfully treaded the fine line required by our case law.

### D. Special Unanimity Instruction

The trial judge gave a standard "general unanimity" instruction as part of his final charge to the jury:

> The verdict in this case must represent the considered judgment of each juror. In order to return a verdict, each juror must agree on the verdict. In other words, your verdict must be unanimous.

*See* Criminal Jury Instructions for the District of Columbia, No. 2.405 (5th ed. 2010).

Appellant contends that the judge also should have given a "special unanimity" instruction on the charges of carrying a pistol without a license in a gun-free zone and possession of a firearm by a convicted felon. In particular, appellant asserts that the judge was required, in the circumstances, to instruct the

jury that all twelve jurors must agree on a particular act of carrying or possession of the Bulldog revolver before the jury could find him guilty of either weapons offense. Without a special unanimity instruction, appellant argues, there is an unacceptable risk that the jury found him guilty of the weapons offenses through non-unanimous verdicts, *i.e.*, that some jurors found him guilty based on evidence of his carrying and possession of the revolver in the basement of the Ord Street house while others found him guilty based on evidence of his carrying and possession of the gun in the van. Appellant contends that the error requires the reversal of his convictions on both weapons charges even though he did not request a special unanimity instruction at trial.

The right to a unanimous verdict is an "indispensable feature of the Sixth Amendment right to trial by jury." *Scarborough v. United States*, 522 A.2d 869, 872 (D.C. 1987) (en banc). The unanimity guarantee "requires jurors to be in substantial agreement as to just what a defendant did as a step preliminary to determining whether the defendant is guilty of the crime charged." *Id*. at 873 (quoting *United States v. Gipson*, 553 F.2d 453, 457-58 (5th Cir. 1977)). Thus, whenever one count in an indictment encompasses two or more separate criminal acts, the trial judge must instruct the jury that a guilty verdict may be returned only

if all jurors agree "as to the specific act the defendant committed." *Id*.; *see also Wynn v. United States*, 48 A.3d 181, 192 (D.C. 2012).[2]

A special unanimity instruction is not required, however, "when a single count is charged and the facts show a continuing course of conduct, rather than a succession of clearly detached incidents." *Gray v. United States*, 544 A.2d 1255, 1258 (D.C. 1988). In that event, the alleged actions of the defendant are not distinct, either factually or legally, and a special instruction is not necessary to ensure unanimity among the members of the jury. *Id*.

---

[2] The current edition of the standard Red Book instructions contains the following instruction on special unanimity:

> [Name of defendant] has been charged with one count of [name of offense]. You have heard evidence of more than one act or incident related to this count. [Describe the separate acts/incidents.] You may find [name of defendant] guilty on this count if the government proves beyond a reasonable doubt that [name of defendant] committed either of these acts/incidents. However, in order to return a guilty verdict on this count, you must all agree that [name of defendant] committed [describe first act/incident] or you must all agree that [name of defendant] committed [describe second act/incident] [repeat if other alternative acts/incidents].

Criminal Jury Instructions for the District of Columbia, No. 2.406 (5th ed. 2014).

It is a close question whether a special unanimity instruction was required in these circumstances.  On the one hand, we have held in the merger context that the act of carrying or possessing a weapon "is continuous and may be committed by a person who is moving from place to place," *Bruce v. United States*, 471 A.2d 1005, 1007 (D.C. 1984), and there is no evidence in the record that appellant ever broke his continuous (and unlawful) carrying and possession of the Bulldog revolver throughout the events at issue by putting it away or (as to the charge of carrying a pistol without a license) by returning it to his home, place of business, or other location at which his carrying of the weapon might not have been unlawful, *see id.* On the other hand, we have recognized that "unanimity and merger inquiries must be approached from different perspectives in light of the different constitutional principles they are meant to safeguard," *Bryant v. United States*, 93 A.3d 210, 219 (D.C. 2014), and we are concerned, in light of the jury's inability to reach unanimous verdicts on the charges arising from the shootings of Mr. Brown and Mr. Stuckey, that the jury also may have been divided on the question whether appellant carried and possessed the Bulldog revolver in the van.  In this regard, we reiterate our recent statement that "[i]n determining whether a special unanimity instruction was required, we need only determine that it was possible, based on the evidence, for the jury to reasonably perceive separate incidents and then base their convictions on different factual predicates." *Id*. at 220-21.

We need not resolve this difficult question, however, because appellant's failure to request a special unanimity instruction at trial subjects his claim to plain error review on appeal, *see id.* at 217; *Wynn*, 48 A.3d at 192, and appellant cannot satisfy the plain error standard. Even if we were to assume, without deciding, that the trial judge's failure sua sponte to give a special unanimity instruction met the first three prongs of the plain error standard – *i.e.*, that it was a clear error affecting appellant's substantial rights – appellant cannot meet the fourth prong of the plain error standard by showing that a decision on appeal declining to correct the error would seriously erode the fairness, integrity, or public reputation of judicial proceedings. *See Marshall*, 15 A.3d at 710. First, "we can rely on the 'robust intuition and good common-sense of jurors . . . to apply the standard unanimity charge to circumstances where special unanimity problems lurk.'" *Bryant*, 93 A.3d at 222 (alteration in original) (quoting *Shivers v. United States*, 533 A.2d 258, 263 n.14 (D.C. 1987)). We are thus confident that the general unanimity instruction the judge gave to the jury at trial reduced the danger of non-unanimous verdicts on the weapons offenses. Second, as we discuss below, the government presented abundant evidence at trial of appellant's carrying and possession of the Bulldog revolver in the basement of the Ord Street house and in the van in which the shootings occurred. As we held in *Bryant*, the government's presentation of

ample evidence at trial of a defendant's commission of all of the separate acts constituting an offense precludes the defendant on appeal from "carry[ing] his burden on this [fourth] prong of plain error analysis." *Id*. at 225. We therefore find no reversible error.

### E. Jury Poll

The trial judge conducted a poll of the jury immediately after the jury's foreperson announced the jury's partial verdict on the offenses of first-degree premeditated murder while armed (not guilty), carrying a pistol without a license in a gun-free zone (guilty), and possession of a firearm by a convicted felon (guilty). Without objection from either party, the judge gave the jury the following explanation before conducting the poll:

> Ladies and gentlemen of the jury, I'm going to do what is now called a poll of the jury and I'm going to do it by seat number. I'm going to ask you if you agree with the verdict as stated by your foreperson. If you agree with the verdict, say "I agree." If you disagree with the verdict, say "I disagree." Don't say anything else. Okay?

The judge then asked each juror individually for the juror's answer to the question whether the juror agreed with the verdict as stated by the foreperson. The record reflects that each of the twelve jurors stated unequivocally either "yes" or "I agree" in response to the judge's question.

Appellant contends that it was error for the judge to limit the jurors' responses to "I agree" or "I disagree." Particularly given the absence of a special unanimity instruction on the weapons offenses, appellant argues, the judge's directions to the jurors preceding the poll were too restrictive. We are not persuaded.

The purposes of a jury poll are to determine whether each individual juror agrees with the verdict as announced by the jury's foreperson and to assure that no juror has been coerced into stating agreement with a verdict with which the juror disagrees. *Harris v. United States*, 622 A.2d 697, 700-01 (D.C. 1993) (citing *Crowder v. United States*, 383 A.2d 336, 340 (D.C. 1978)). "The jury poll is the primary device for discovering doubt or confusion of individual jurors and has long been regarded as a useful and necessary tool for preserving the defendant's right to a unanimous verdict." *Id.* at 700; *see generally* Super. Ct. Crim. R. 31 (d).

The trial judge has "an appreciable measure of discretion" in determining how best to conduct a poll of the jury, *Jones v. United States*, 779 A.2d 357, 360 (D.C. 2001) (quoting *Harris*, 622 A.2d at 701), and we have never prescribed any particular questions or sets of questions that must be asked. Even where a timely objection to the method used to conduct the poll has preserved the issue for appeal, we review only for abuse of discretion and "will affirm if we can 'say with assurance that the jury freely and fairly arrived at a unanimous verdict.'" *Id.* at 360-61 (quoting *Harris*, 622 A.2d at 701). And where, as here, no objection has been made in the trial court, we review for plain error and "will reverse . . . 'only in exceptional circumstances where a miscarriage of justice would otherwise result.'" *Id.* at 360 (quoting *Brawner v. United States*, 745 A.2d 354, 357 (D.C. 2000)).

We find no abuse of discretion, and certainly no plain error, in the way the trial judge conducted the poll of the jury. The judge addressed each juror individually and determined that all twelve jurors agreed with the partial verdict announced by the foreperson. No juror expressed any doubt or confusion about the partial verdict, and nothing in the record suggests that any juror even hinted at having been coerced or induced into falsely stating his or her agreement. Indeed, we think it was wise, in the circumstances, for the judge to limit the jurors'

responses to his polling question. The judge knew the jury was divided on all charges other than the three to be resolved through the jury's partial verdict, and it was essential to the jury's ability to continue its deliberations on the unresolved charges that the jurors not divulge any information about their thought processes or the substance of their ongoing discussions. *See Fortune v. United States*, 65 A.3d 75, 83 (D.C. 2013) (discussing the "weighty" policy reasons for "insulating the jury's deliberative process").

## F. Sufficiency of the Evidence

Appellant moved for a judgment of acquittal on all counts at the end of the government's case-in-chief and again at the close of the evidence. The trial judge denied both motions. Appellant claims error, asserting that the government's witnesses were so inherently incredible, and so thoroughly impeached, that their testimony about his carrying and possession of the Bulldog revolver was legally insufficient to support his convictions for carrying a pistol without a license in a gun-free zone and possession of a firearm by a convicted felon. We disagree.

A party seeking to exclude a witness's testimony from consideration based on the doctrine of inherent incredibility must satisfy a "stringent test." *Payne v.*

*United States*, 516 A.2d 484, 494 (D.C. 1986). Specifically, the doctrine "can be invoked only when the testimony can be disproved . . . as a matter of logic by the uncontradicted facts or by scientific evidence, or when the person whose testimony is under scrutiny made allegations which seem highly questionable in the light of common experience and knowledge, or behaved in a manner strongly at variance with the way in which we would normally expect a similarly situated person to behave." *In re A.H.B.*, 491 A.2d 490, 496 n.8 (D.C. 1985) (ellipsis in original) (quotations and citations omitted). "A certain amount of inconsistency in the evidence is almost inevitable in any trial, but it rarely justifies reversal." *Id*. at 495. Evidence is not legally insufficient to support a criminal conviction merely because the testimony of the witnesses has been contradictory and the explanations for the inconsistencies difficult to believe. *Id*. (citing *United States v. Jackson*, 579 F.2d 553, 558 (10th Cir. 1978)). To the contrary, "a witness may be inaccurate, contradictory and even untruthful in some respects and yet be entirely credible in the essentials of his testimony." *Id*. (quoting *United States v. Tropiano*, 418 F.2d 1069, 1074 (2d Cir. 1969)).

More generally, whenever we consider the legal sufficiency of the evidence presented in support of a criminal conviction, "we view the evidence in the light most favorable to the government, giving full play to the right of the jury to

determine credibility and to weigh and draw justifiable inferences from the evidence." *Jackson v. United States*, 940 A.2d 981, 987 n.3 (D.C. 2008) (citing *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc)). Although we are "not a rubber stamp," *Swinton v. United States*, 902 A.2d 772, 776 n.6 (D.C. 2006), we "must deem the proof of guilt sufficient if, 'after viewing the evidence in the light most favorable to the prosecution, [we conclude that] *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt,'" *Rivas*, 783 A.2d at 134 (quoting *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original)).

We are satisfied that the government's evidence at trial was legally sufficient to support appellant's convictions on the weapons charges. Five witnesses testified that appellant had a gun on his person on the night of July 3-4, 2009. Ms. Frazier, her son Antonio, and Mr. Stuckey all told the jury that appellant had a gun in his jacket pocket while he and others shot dice in the basement of the Ord Street house; as discussed above, Mr. Stuckey stated that he had seen the same gun in appellant's possession three times before and that he recognized it as a .44 caliber Bulldog revolver when it fell out of appellant's pocket onto the basement floor. Mr. Jones and Mr. Smith testified that appellant later had a chrome revolver in his hand after several shots were fired inside the van. All of this testimony was

corroborated by undisputed evidence that two people were shot inside the van and by the testimony of the government's firearms expert that the bullets recovered from Mr. Brown's body were fired from either a .44 caliber Charter Arms Bulldog revolver or a .44 caliber U.S. Arms Magnum revolver. Although the government's witnesses testified inconsistently on some points and were impeached on others, appellant has not established that their testimony was disproved as a matter of fact or logic or otherwise shown to be inherently incredible. The discrepancies in the testimony were properly left for the jury to resolve, and we have no difficulty concluding that a rational trier of fact could have resolved the discrepancies in favor of the government and found the essential elements of each of the weapons offenses beyond a reasonable doubt.

**G. Jury Instruction on CPWL in Gun-Free Zone**

The trial judge gave the following instruction to the jury on the offense of carrying a pistol without a license in a gun-free zone:

> The essential elements of the offense of carrying a pistol without a license, each of which the government must prove beyond a reasonable doubt, are: number one, that Thomas Jones carried a pistol on or about his person; number two, that he did so voluntarily and on purpose, and not by mistake or accident; number three, that

Thomas Jones was not licensed to carry the pistol by the Chief of Police of the District of Columbia; and number four, he carried the pistol in a place other than his home, place of business, or land or premises possessed and controlled by him; that the pistol could fire a bullet; and that at the time he carried the pistol, he did so in a gun-free zone, that is, within 1,000 feet of Kenilworth Elementary School. The term "pistol" means a firearm that has a barrel less than 12 inches.

Appellant contends that another essential element of the offense, omitted from the trial judge's instruction, was the presence of a sign on the premises of Kenilworth Elementary School identifying the school and its surrounding area as a gun-free zone. Appellant argues that the judge's failure to include this element in the instruction to the jury entitles him to the reversal of his conviction for carrying a pistol without a license in a drug-free zone.

We agree that the instruction was incomplete. The statute defining the penalty enhancement for carrying a pistol without a license in a gun-free zone makes clear that the enhancement does not apply unless there is a sign on the premises identifying the building or area as a gun-free zone:

All areas within[] 1000 feet of an *appropriately identified* public or private day care center, elementary school, vocational school, secondary school, college, junior college, or university, or any public swimming pool,

> playground, video arcade, youth center, or public library, or in and around public housing . . . shall be declared a gun free zone. *For the purposes of this subsection, the term "appropriately identified" means that there is a sign that identifies the building or area as a gun free zone.*

D.C. Code § 22-4502.01 (a) (2012 Repl.) (emphasis added).

A proper instruction on the elements of carrying a pistol without a license in a gun-free zone therefore must inform the jury that the school (or other building or area) is a gun-free zone only if a sign on the premises identifies it as such. *See* Criminal Jury Instructions for the District of Columbia, No. 8.102 (5th ed. 2010) (including as an element of the gun-free zone enhancement that "[t]here was a sign identifying [the school or other qualifying building or area] as a gun-free zone"). The trial judge's instruction lacked this essential information.

Appellant, however, lodged no objection to the instruction in the trial court, and his claim of instructional error is therefore subject to plain error review on appeal. *See Bellamy v. United States*, 810 A.2d 401, 406 (D.C. 2002). Under the plain error standard, an incomplete jury instruction to which no objection was made at trial "will not be a cause for reversal where . . . no rational jury, shown by its verdict to have found the facts necessary to convict the defendant under the

instructions as given, could have failed, if fully instructed on each element, to have found in addition the facts necessary to comprise the omitted element." *Id.*

Appellant is not entitled to reversal. The parties stipulated at trial that Kenilworth Elementary School "has a sign placed on the east side of the school on 44th Street that states that illegal firearms may not be within 500 feet of the school" and that a "custodian of the school would testify that the sign has been posted at that location for several years, which time includes July 3rd, 2009, and July 4th, 2009." The parties read this stipulation (and others) to the jury during the trial, and the judge later provided a written copy of all of the stipulations to the jury during the jury's deliberations. In addition, a photograph of the school grounds admitted in evidence clearly showed the sign identifying the school and its surrounding area as a gun-free zone. In these circumstances, there is no basis for concern that the jury, acting rationally, would have declined to find appellant guilty of carrying a pistol without a license in a gun-free zone had the trial judge's instruction properly included the requirement that there be a sign on the premises identifying the school building and its surrounding area as a gun-free zone. There was no dispute at trial over whether the area surrounding Kenilworth Elementary School was properly identified as a gun-free zone, and the omission from the judge's instruction thus could not have had any prejudicial impact on the outcome of the case. *See*

*(Marques An'Rico) Johnson v. United States*, 2015 D.C. App. LEXIS 264, No. 13-CF-929, slip op. at 15-16 (D.C. June 18, 2015) ("on plain-error review, incorrect jury instruction was not reversible error because there was no reasonable probability that it had a prejudicial impact on the outcome of the trial") (citing *Kidd v. United States*, 940 A.2d 118, 128 (D.C. 2007)).

## H. Lawfulness of Sentences Imposed

The trial judge sentenced appellant to concurrent terms of imprisonment of eight years for carrying a pistol without a license in a gun-free zone and twelve years for possession of a firearm by a convicted felon. The judge ordered that the prison terms be followed by concurrent three-year periods of supervised release. The judge did not specify any mandatory minimum prison time.

Appellant contends that the twelve-year prison sentence for possession of a firearm by a convicted felon exceeded the maximum penalty authorized by law at the time of the offense. The government conceded this point at oral argument, and we agree that the sentence imposed for possession of a firearm by a convicted felon was illegal.

At the time of the events in this case, District of Columbia law provided that a felon convicted of possession of a firearm faced a maximum possible sentence of ten years in prison and a one-year mandatory-minimum prison term. D.C. Code § 22-4503 (a)(2) (2008 Supp.). The District of Columbia Council soon amended the District's gun control laws, retaining the ten-year maximum and one-year mandatory-minimum periods of incarceration for ordinary felon-in-possession charges and creating an enhanced penalty of up to fifteen years in prison, with a three-year mandatory-minimum term, for possession of a firearm by a person previously convicted of a felony defined in the bail statute as a crime of violence. *See* D.C. Code §§ 22-4503 (b)(1) & (d)(1) (2010 Supp.); *see also* D.C. Code § 23-1331 (4) (2010 Supp.) (defining "crime of violence"); *see generally* Council of the District of Columbia, Comm. on Pub. Safety and the Judiciary, Report on Bill 8-151, "Omnibus Public Safety and Justice Amendment Act of 2009" (June 26, 2009). However, although it is undisputed that appellant had a prior conviction for a crime of violence (second-degree murder while armed), the amendments to the District's gun control laws did not take effect until December 10, 2009, *see* Omnibus Public Safety and Justice Amendment Act of 2009, D.C. Law 18-88, 56 D.C. Reg. 7413 (December 10, 2009), and the Ex Post Facto Clause prohibits their retroactive application to appellant even though they were fully in effect by the

time of his trial, *see Carmell v. Texas*, 529 U.S. 513, 522 (2000) (citing *Calder v. Bull*, 3 U.S. 386, 390 (1798)).

The twelve-year prison sentence imposed for possession of a firearm by a convicted felon was therefore illegal in two respects: it exceeded the ten-year statutory maximum in effect at the time of the offense, and it failed to specify a one-year mandatory-minimum period of incarceration. The sentence must be vacated and the case remanded for resentencing on this charge in accordance with applicable statutory requirements.[3]

Finally, in a Rule 28 (k) statement filed after oral argument, appellant contends, for the first time, that his eight-year prison sentence for carrying a pistol without a license in a gun-free zone also exceeded the maximum penalty allowed by law at the time of the offense. We disagree. First, the law in effect as of July 3-4, 2009 plainly provided that a felon convicted of carrying a pistol without a

---

[3] Because District of Columbia law requires the sentencing judge in a felony case to withhold part of the maximum possible prison term as "back-up time" in the event of the subsequent revocation of the defendant's supervised release, the longest prison term that can be imposed at the time of resentencing on the charge of possession of a firearm by a convicted felon is eight years, equal to the ten-year statutory maximum penalty in effect at the time of the offense minus the two-year period that must be reserved as back-up time. *See* D.C. Code §§ 24-403.01 (b)(7)(C) & (b-1) (2009 Supp.).

license faced a maximum possible sentence of ten years in prison and a $10,000 fine. *See* D.C. Code § 22-4504 (a)(2) (2009 Supp.). Indeed, District of Columbia law has authorized a ten-year prison sentence for carrying a pistol without a license by a convicted felon for at least the past thirty-five years. *See Henson v. United States*, 399 A.2d 16, 21 (D.C. 1979) (highlighting a felon's "[e]xposure to a possible ten-year sentence under § 22-3204," the predecessor to § 22-4504 (a)(2)). Second, the gun-free zone enhancement doubled the maximum possible sentence appellant faced for carrying a pistol without a license. *See* D.C. Code § 22-4502.01 (b) (2009 Supp.) ("Any person illegally carrying a gun within a gun free zone shall be punished by a fine up to twice that otherwise authorized to be imposed, by a term of imprisonment up to twice that otherwise authorized to be imposed, or both."). Appellant thus faced a maximum possible penalty of twenty years in prison and a $20,000 fine for carrying a pistol without a license in a gun-free zone. The eight-year term imposed, therefore, was not unlawful.

### III. CONCLUSION

For the foregoing reasons, we vacate appellant's sentence for the offense of possession of a firearm by a convicted felon and remand the case for resentencing on that charge. The judgment of the Superior Court is otherwise affirmed.

*It is so ordered.*