*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 18-CF-1183

CARLOS JOHNSON, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(2018-CF2-006369)

(Hon. Robert Salerno, Trial Judge)

(Argued June 3, 2021                    Decided March 9, 2023)

*Deborah A. Persico* for appellant. *Anne Keith Walton* also entered an appearance.

*Ethan L. Carroll*, Assistant United States Attorney, with whom *Timothy J. Shea*, United States Attorney at the time, and *Elizabeth Trosman*, *John P. Mannarino*, *Bryan Han*, and *Julia Cosans*, Assistant United States Attorneys, were on the brief, for appellee.

Before EASTERLY and MCLEESE, *Associate Judges*, and GLICKMAN,[*] *Senior Judge.*

---

[*] Judge Glickman was an Associate Judge at the time of argument.

GLICKMAN, *Senior Judge*:  Appellant Carlos Johnson was charged in a six-count indictment with unlawful possession of a firearm by a person previously convicted of a felony (FIP),[1] possession of an unregistered firearm (UF),[2] two counts of possession of a large capacity ammunition feeding device (PLCAFD),[3] and two counts of unlawful possession of ammunition (UA).[4]  The indictment alleged that appellant possessed each of these items "on or about April 25, 2018," which was the date the police discovered them in a search of appellant's residence.  After a three-day trial, the jury convicted appellant of FIP, UF, one count of PLCAFD (relating to the 30-round capacity magazine), and one count of UA (relating to the .40-caliber ammunition), and acquitted him of the other two counts.

Seeking reversal, appellant claims that the trial court erred in admitting evidence from the records of his Instagram account, presented as part of the government's proof that he committed the charged offenses, and that there was

---

[1] D.C. Code § 22-4503(a)(1), (b)(1).

[2] *Id.* § 7-2502.01(a).

[3] *Id.* § 7-2506.01(b).  Although the indictment did not specify this, one count was for possession of an extended magazine with a 30-round capacity, and the other count was for possession of a magazine with a 15-round capacity.

[4] *Id.* § 7-2506.01(a)(3).  One count was for possession of .40-caliber ammunition, and the second count was for possession of 9-mm ammunition.

insufficient evidence of constructive possession to support his convictions. He further claims that the court erred in responding to questions from the deliberating jury and in giving a coercive anti-deadlock instruction. We are not persuaded by appellant's arguments, and we affirm his convictions.

## I. Trial

At approximately 6:30 in the morning on April 25, 2018, Metropolitan Police Department (MPD) officers executed a search warrant at appellant's two-bedroom apartment. In one of the bedrooms, the officers found appellant and his former girlfriend, Shaquice Campbell. Ms. Campbell, whom the government called as a witness at trial, was asleep in the bed. Appellant was lying on the floor next to the bed. In a corner of the room by the closet, less than a foot away from appellant, lay a black, .40-caliber M&P Smith & Wesson handgun with a red laser sight attached to it. The gun had one .40-caliber round in the chamber and nineteen .40-caliber rounds in an attached large capacity extended magazine.

Underneath the bed, which the officers had to lift up in order to search the area, they found eight rounds of 9-mm ammunition inside a sock, and two handgun magazines, one with a 12-round capacity that was loaded with nine .40-caliber rounds of ammunition, and the other with a 15-round capacity loaded with fifteen

.40-caliber rounds. The officers found seven more rounds of .40-caliber ammunition in a small box in the top drawer of the bedroom dresser.

Ms. Campbell testified at trial that she had gone to the apartment a few hours earlier that morning to visit appellant. She said she did not know where the gun came from and that she had not seen it before she fell asleep on appellant's bed.

Appellant was not wearing pants when the police entered his bedroom. A pair of jeans was lying on the floor beside the firearm. In the jeans the police found a wallet containing appellant's D.C. identification card. Elsewhere in the bedroom, the officers found a folder containing appellant's birth certificate and resume. The information on the resume included appellant's name, his home address, his phone numbers, and his email address. The police also found other paperwork in appellant's name in the bedroom, and photographs of appellant and his mother.

In the second bedroom, the officers found appellant's sister, Lashawn Johnson, asleep in bed. Ms. Johnson was the only other person in the apartment. The police did not find firearms, ammunition, or ammunition magazines in her bedroom or anywhere else in the apartment but appellant's bedroom.

The police found and seized five cellphones during their search of the apartment, three of them from appellant's bedroom and two from the living room. Detective Thomas Roy noticed one of the bedroom phones was receiving messages for an Instagram account. Detective Roy turned off the phone and later obtained and sent to Instagram a search warrant for its records of that account.

Prior to trial, the government moved in limine to admit some of the account records produced by Instagram in response to that warrant, including video clips, photographs, and textual messages. The government proffered this material as direct and substantial proof that appellant possessed the Smith & Wesson handgun recovered from his bedroom.[5] Appellant opposed the motion, contending among other things that the government could not attribute the Instagram account or its contents to him, and that even if it could, the messages and videos the government wished to introduce were not probative of the crimes with which he was charged.

After reviewing the evidence and hearing the parties' arguments, the trial judge ruled that, subject to being properly authenticated at trial, the proffered

---

[5] No fingerprints were recovered from the firearm or magazine seized by the police. DNA analysts were unable to derive DNA profiles from swabs of the firearm and its magazine.

evidence (with immaterial exceptions) would be admissible as direct proof of the charged crimes. The judge found that the video clips showed someone resembling appellant holding a "firearm resembling the one at issue . . . close enough in time to the date of the seizure" of the handgun in appellant's apartment to be relevant direct evidence that appellant possessed that handgun. The judge further found sufficient circumstantial evidence to allow the jury to find that appellant admitted in a textual message that he possessed the handgun's large capacity magazine.

At trial, the government called Facebook's custodian of records, Amy Servas. Facebook had acquired Instagram, and Ms. Servas testified that she could authenticate both Facebook and Instagram records. Ms. Servas explained that Instagram is a social media network where account holders can share photos, videos, and textual messages with other Instagram account holders. These include what Ms. Servas referred to as "direct shares," which are private communications between account holders that are not publicly available. Ms. Servas explained that Instagram maintains exact electronic copies of all this material in its business records for each account, along with other data including the email address, cell phone number, user/screen name, and profile picture provided by the account holder who opened the account.

Ms. Servas identified business records produced in response to the search warrant for the Instagram account. This account bore the user (or screen) name "being_loyal_bring_u_pain" (hereinafter, "Being Loyal").[6] These records showed that the Being Loyal account was registered by the account holder to the same email address and the same cell phone number that were shown as appellant's in the resume that the police found in his bedroom. As Ms. Servas testified, the account records stated that Facebook had confirmed the cell phone number by sending to it a text message with a verification code, which the recipient (presumably appellant) then sent back to Facebook to confirm his opening of the Instagram account. Ms. Servas identified the photograph that the account holder had submitted to Instagram as their "profile" picture; it was a photograph of appellant. Instagram's production also included a number of other photographs of appellant that had been posted to Being Loyal's Instagram account.[7]

The records produced by Instagram and identified by Ms. Servas included four short video clips sent to Being Loyal on February 18, 2018, from another

---

[6] The business records do not identify the account holder by name, but instead by a pseudonym, "ripmalongLiveBLove."

[7] Appellant's former girlfriend, Ms. Campbell, identified appellant in these photographs at trial.

Instagram account with the user/screen name "got_no_respect" (hereinafter, "No Respect"). In each clip, appellant is seen dancing to music along with other persons and waving an object in his hand that looks like a black handgun with a red laser-sight attachment and what was described as a "drum" ammunition magazine. In the videos, the laser sight is activated and emits a bright red beam. The government contended that the gun depicted in these videos was the same gun with the same red laser sight that the police found and seized in appellant's bedroom on April 25, 2018, though with a different magazine inserted.[8] On cross-examination, Ms. Servas agreed that the account records did not disclose who recorded the videos or when or where they were recorded.

Ms. Servas also identified an exchange of private direct share messages on April 17, 2018 (one week before the police executed the search warrant at appellant's apartment) between the Being Loyal and No Respect accounts. The exchange of messages was set forth verbatim in Instagram's account records. During that exchange, No Respect sent Being Loyal a photo of an extended ammunition magazine with the label "ProMag S&W M&P 40" and asked whether that was what Being Loyal had. (The photo also was included in the account records.) In response,

_____

[8] The police did not find a drum magazine in appellant's apartment. Appellant was not charged with possession of such a magazine.

Being Loyal confirmed to No Respect that he possessed the magazine shown in that photo, which the government claimed was like the one in the .40-caliber M&P Smith & Wesson handgun found on the bedroom floor beside appellant.[9] On cross-examination, Ms. Servas acknowledged that someone who obtained an Instagram account holder's account name and password would be able to log into the account without using the holder's cell phone, and post as if they were the account holder.

An employee in the MPD's gun registration unit testified that appellant did not have a registration certificate entitling him to possess a firearm in the District of

---

[9] The direct share exchange between Being Loyal and No Respect on April 17, 2018, went as follows:

| Time | Author | Text |
|------|--------|------|
| 4:03:47 | No Respect | "What ur shit look like" |
| 4:04:03 | Being Loyal | "Look it up" |
| 4:04:37 | No Respect | "U playing but what its it again" |
| 4:07:17 | [No Respect sends photograph of an extended magazine labelled "ProMag S&W M&P40"] | |
| 4:07:28 | No Respect | "Thats urs" |
| 4:07:31 | Being Loyal | "Yea" |

Columbia, and the parties stipulated that he had previously been convicted of a crime punishable by imprisonment for a term exceeding one year.

Called as a defense witness, appellant's sister, Lashawn Johnson, testified that the .40-caliber handgun found beside appellant in his bedroom was actually hers.[10] She said she bought it in December of 2017 and had kept it under her pillow in her bedroom. However, she said, because she planned to leave the apartment early on the morning of April 25, 2018, for an appointment, she took the gun to appellant's bedroom and left it there with him while he was still asleep. She said she did this "[s]o he could feel safe" when he awoke and saw the weapon there with him. Ms. Johnson explained that appellant had recently been the victim of a shooting, and that the "only way" he felt "okay" in her absence was if he had guns around; "[t]he guns around make him feel safe," she said. Ms. Johnson further testified that she had 9-mm and .40-cal. ammunition and ammunition magazines in the apartment on April 25. She said she kept her ammunition in a box in appellant's bedroom dresser and in a sock under his bed, and the magazines on the floor in his bedroom. However,

---

[10] Ms. Johnson said this was one of two handguns she possessed at the time, the other being a 9-mm Ruger. The police did not discover the Ruger during their search of the apartment.

Ms. Johnson testified that she had never seen appellant holding a gun and that, to her knowledge, he was unaware of the ammunition in his room.

On cross-examination, government counsel questioned Ms. Johnson about the Being Loyal Instagram account. Ms. Johnson denied knowing that appellant had an Instagram account, and she initially denied having an Instagram account of her own. Thereafter, however, she testified that she had used the Being Loyal account herself, as (she said) did "[a] lot of people" including appellant's friends. Ms. Johnson identified appellant as the individual waving the object with the red laser sight in the four videos posted in the Being Loyal account.[11]

## II. Authentication and Admission of the Instagram Records

Appellant argues that the trial court erred in ruling that the videos showing him waving a handgun and the direct share exchange concerning his possession of a large capacity magazine were properly authenticated, and in admitting that evidence as direct proof of the charged crimes. Although these contentions overlap, we address them separately.

---

[11] No photographs or videos were introduced in evidence showing Ms. Johnson in possession of the black, .40-caliber M&P Smith & Wesson handgun, nor did she claim to have engaged in the April 17 direct share exchange with No Respect.

## A. Authentication

Regarding the authenticity of the evidence from the Being Loyal Instagram account, appellant claims that "at best, the government proffered that appellant may have at times had access to the Instagram account which contained posts of the videos, messages and photo[s] admitted into evidence." But, appellant continues, the government provided "no evidence" that he was the only person who had access to the Being Loyal account, and he cites the testimony of his sister and Instagram's records custodian that others used or (if possessed of his password and account name) could have used the account. In addition, appellant argues that the government failed to present evidence establishing that the videos were not "doctored" to falsely show him in possession of a firearm he did not actually have, that the objects in the videos were "*actual* firearms as opposed to a replica or a toy," or that the videos were created around the time they were uploaded. Appellant further asserts that the government provided no evidence that he actually possessed the extended magazine depicted in the April 17 direct share exchange between Being Loyal and No Respect, that he was the author of any of the messages in that exchange, or that the messages had not been altered. Consequently, appellant contends, "the government failed to proffer sufficient evidence of the authenticity,

accuracy and trustworthiness of any of the social media posts," and the trial court therefore should not have admitted the evidence.

Authenticity — whether an item of evidence is genuinely what its proponent claims it is — is a component of relevance. Evidence must be relevant to be admissible. "Evidence is relevant if it has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'"[12] Thus, "'[t]he test for relevance is not a particularly stringent one,' requiring only a 'reasonable possibility' of a link between the contested evidence and the crime."[13] Accordingly, this court has held that authenticity need not be established with certainty as a "condition precedent" to the admission of evidence as relevant; rather, in general, "all that must be shown" is a "reasonable possibility" that the evidence is "what it purports to be."[14]

---

[12] *Plummer v. United States*, 813 A.2d 182, 188 (D.C. 2002) (quoting *Street v. United States*, 602 A.2d 141, 143 (D.C. 1992)).

[13] *Stewart v. United States*, 881 A.2d 1100, 1110 (D.C. 2005) (first quoting *Street*, 602 A.2d at 143; and then quoting *Winfield v. United States*, 676 A.2d 1, 4 (D.C. 1996) (en banc)).

[14] *Id.* at 1111. "Where there is reason for suspicion that a document is not what it purports to be," the *Stewart* court added, "the trial judge, in the exercise of his or her discretion, may exclude it from evidence." *Id.* (quoting *Murphy v. McCloud*, 650 A.2d 202, 214 (D.C. 1994)).

In other words, as is true under the Federal Rules of Evidence as well, authentication as a condition of admissibility merely requires the proponent of the evidence to show that a jury reasonably could find the evidence to be genuine by a preponderance of the evidence.[15]  Once that showing has been made, the opposing party "remains free to challenge the reliability of the evidence, to minimize its importance, or to argue alternative interpretations of its meaning, but these and similar other challenges go to the *weight* of the evidence — not to its *admissibility*."[16]

---

[15] *See United States v. Vayner*, 769 F.3d 125, 129-30 (2d Cir. 2014) (explaining that the authentication "'requirement is satisfied if sufficient proof has been introduced so that a reasonable juror could find in favor of authenticity or identification.'  The ultimate determination as to whether the evidence is, in fact, what its proponent claims is thereafter a matter for the jury" (citation omitted)); *see also United States v. Browne*, 834 F.3d 403, 409-10, 413 (3d Cir. 2016) (citing Federal Rule of Evidence 104(b), and holding that government presented sufficient extrinsic evidence to authenticate chats on a social media site); *United States v. Maritime Life Caribbean Ltd.*, 913 F.3d 1027, 1032-33 (11th Cir. 2019) (holding that trial court erred by excluding document because proponent failed to prove its authenticity by "the greater weight of the evidence."  "A two-step process governs the determination of whether a document is authentic.  The district court must first make a preliminary assessment of authenticity under Rule 901, which requires a proponent to present sufficient evidence to make out a prima facie case that the proffered evidence is what it purports to be.  If the proponent satisfies this prima facie burden, the inquiry proceeds to a second step, in which the evidence may be admitted, and the ultimate question of authenticity is then decided by the factfinder." (citations, internal quotation marks, and alteration omitted)).

[16] *Vayner*, 769 F.3d at 131 (quoting *United States v. Tin Yat Chin*, 371 F.3d 31, 38 (2d Cir. 2004)); *accord Stewart*, 881 A.2d at 1111 (stating that under the "reasonable possibility" standard, "the absence of a definitive link to the crime or the defendant merely affects the weight of the evidence, not its admissibility").

We deem these principles to apply in full to the authentication of social media records as well as traditional documentary (and other) evidence, albeit they must be applied with the need for alertness to the ways in which electronically stored data "can be manipulated or corrupted" and the "ease with which a social media account may be falsified or a legitimate account may be accessed by an imposter."[17] The requisite likelihood of authenticity may be shown by direct evidence or circumstantial evidence. "Although a witness with personal knowledge may authenticate a document by testifying that the document is what the evidence

---

[17] *Browne*, 834 F.3d at 412. We note that this court has recognized one exception to the "reasonable possibility" standard of authentication: We have held that a party seeking to introduce tape recordings of voice conversations must establish they are "authentic, accurate, and trustworthy" by clear and convincing evidence. *Butler v. United States*, 649 A.2d 563, 567 (D.C. 1994) (quoting *Springer v. United States*, 388 A.2d 846, 852 (D.C. 1978)). *But cf. id.* ("To establish the authenticity, accuracy and trustworthiness of the tape, we have also required that 'the possibilities of misidentification and adulteration be eliminated, not absolutely, but as a matter of reasonable probability.'" (quoting *Springer*, 388 A.2d at 852)). This heightened standard (whether it is really "clear and convincing evidence" or merely "reasonable probability") reflects concerns that voice identifications may be unreliable and particularly difficult to make, that recording, reproduction, and preservation processes may result in distortion, loss of content, or other inaccuracies, and that "more so than photographs or other demonstrative evidence, sound recordings are susceptible to alterations that may be impossible to detect." *Id.* (quoting *United States v. Biggins*, 551 F.2d 64, 66 (5th Cir. 1977) (alteration omitted)). Appellant has not argued that a "clear and convincing" standard must be applied to evidence of the kind before us in this case, and we are not persuaded it is necessary here to depart from the generally applicable "reasonable possibility" standard. Rigorous application of the latter standard suffices to take into account whether appellant's Instagram records had been altered or falsified.

proponent claims it to be, this is merely one possible means of authentication and not . . . an exclusive requirement."[18]  For example, and as pertinent in this case, we have recognized that authenticity "may be established by the nature and contents of the writing combined with the location of its discovery."[19]  Evidence that "identity verification is necessary to create" a social media record also may help to confirm its authenticity.[20]  Other courts have concluded that the government sufficiently linked social media pages to the defendants by tracing the pages and the accounts to the defendants' mailing and email addresses.[21]

---

[18] *Browne*, 834 F.3d at 415.

[19] *In re Slaughter*, 929 A.2d 433, 444 (D.C. 2007) (quoting *Settles v. United States*, 570 A.2d 307, 309 (D.C. 1990)); *see also Vayner*, 769 F.3d at 132 (recognizing that "the contents or 'distinctive characteristics' of a document can sometimes alone provide circumstantial evidence sufficient for authentication," as where the contents were not a matter of common knowledge).

[20] *Vayner*, 769 F.3d at 133.

[21] *Browne*, 834 F.3d at 413 (citing *United States v. Hassan*, 742 F.3d 104, 133 (4th Cir. 2014)); *United States v. Lamm*, 5 F.4th 942, 948 (8th Cir. 2021) (holding that cell phone number, email address, photographs of defendant, and related information found in defendant's apartment linked to defendant and the Facebook account sufficient for authentication); *United States v. Quintana*, 763 F. App'x 422, 427 (6th Cir. 2019) (holding that "account in defendant's name, an email address with his name and moniker, a location linked to defendant, dates that correspond to witness testimony, and a picture of defendant" sufficient for authentication but noting that "the government could have done more to connect the Facebook profile to [defendant], like . . . provide evidence linking the email addresses and telephone number on the account with" defendant); *United States v. Lewisbey*, 843 F.3d 653, 658 (7th Cir. 2016) (acknowledging that Facebook account name with defendant's

Decisions to admit or exclude evidence are committed to the trial court's discretion. A trial judge's ruling on the relevance of evidence, including a ruling on authenticity, "is a highly discretionary decision that will be upset on appeal only upon a showing of grave abuse."[22]

We conclude that the judge did not abuse his discretion in ruling the Instagram evidence authenticated and admissible against appellant in this case. The government provided sufficient proof for the jury to find that the video clips and direct share exchange constituted genuine evidence of what the government claimed they showed — appellant's recent actual possession of a firearm like the one the police found in his bedroom, and appellant's recent admission to possession of a large capacity ammunition feeder for that firearm.

To begin with, the government presented substantial evidence that appellant was in fact the holder and a current user of the Being Loyal account from which the video clips and direct share communications were exchanged. The email address and phone number provided when the account was opened matched those found on

---

nickname, and place of residence, email address, and photographs of defendant were relevant for authentication of Facebook page).

[22] *Furr v. United States*, 157 A.3d 1245, 1250 (D.C. 2017) (quoting *Riddick v. United States*, 995 A.2d 212, 216 (D.C. 2010)).

appellant's resume, which the police found with appellant in his bedroom, in a folder along with his birth certificate. Instagram had verified the phone number by texting a code to it and obtaining confirmation, which presumably was provided by appellant since the phone number was his. Consistent with these indicia of appellant's ownership of the account, the records of the account contained numerous photos of appellant, corroborating his usage. Of particular note, his photograph was the profile picture submitted to Instagram by the account holder when the account was opened; such a picture is not self-authenticating, but as the trial judge observed, a profile photo "tends to have greater probative value of who owns the account and who uses the account . . . than simply other pictures sent to or received from the account." And appellant's continuing ownership and use of the Being Loyal account up to the time of his arrest was significantly corroborated by the fact that a cell phone in his bedroom was receiving push notifications from that account when the police were there on April 25, 2018. While appellant's sister claimed that she and others had access to and had used the account, that testimony was not substantiated by the account records or any other evidence, and even if true, it did not refute the government's proof that the account belonged to and was utilized by appellant.[23]

---

[23] *See United States v. Brinson*, 772 F.3d 1314, 1321 (10th Cir. 2014) (holding that, despite evidence that other individuals had access to the Facebook account and had posted messages to it, the trial court could reasonably find that the defendant authored the messages in question); *United States v. Recio*, 884 F.3d 230, 237 (4th

Moreover, the video clips posted to the Being Loyal account from the No Respect account and the private direct share exchange between the two accounts were reasonably linked to appellant personally. There is no genuine dispute that the video clips, sent in mid-February, showed appellant holding and waving an object that appeared to be a black handgun with an extended ammunition magazine and a red laser sight. Like the trial judge, we are persuaded that a jury reasonably could find that the object looked like the same black, .40-caliber M&P Smith & Wesson handgun with a red laser sight that police found next to appellant in his bedroom only two months later. As we discuss in more detail in the next section of this opinion, the jury therefore reasonably could view the clips as direct and substantial evidence that appellant possessed that handgun on April 25.

Similarly, the jury reasonably could find that it was appellant who admitted possessing the large capacity magazine shown in the photo that No Respect sent to Being Loyal on April 17 (which the government contended was the magazine found

---

Cir. 2018) ("[T]here was no evidence that another person accessed the [defendant's] Facebook account. Moreover, what matters is not whether a jury could find that [the defendant] did *not* author the post in question, but rather whether the jury could reasonably find that he *did*. Given the strong evidence that the Facebook account was [the defendant's], and without any evidence of unauthorized access, the jury could find that [the defendant] was the true author of the post. The Government therefore properly authenticated the Facebook post.").

in the gun by appellant's side only a week later). Even if it is conceivable some other person accessed the Being Loyal account and engaged in the private exchange with No Respect, the requirement of authentication did not require the government to prove with "absolute certainty" that it was appellant who did so, only the reasonable possibility that he did so. On the evidence here of appellant's relationship to the Being Loyal account, appellant certainly was the most likely candidate, and a jury could so find.[24]

Appellant argues that the government presented no proof that the Instagram videos had not been doctored in some way and uploaded to falsely incriminate him. But appellant is demanding that the government had to disprove a phantom of his own imagination. There was no evidence that the videos had been doctored or faked in any way. Appellant offered no reason to think it at all likely that someone had fabricated and sent him video evidence showing him dancing with a handgun. The same is true of appellant's argument that the government failed to prove the messages in the direct share exchange had not been materially altered. Appellant advanced no evidence of such alteration. Given that those messages were recorded

---

[24] Indeed, the "coincidence" that a large capacity magazine for the .40-caliber Smith & Wesson handgun was found next to appellant just a week after Being Loyal claimed to have such a magazine itself strengthens the inference that it was appellant who made that claim.

in real time and maintained by Instagram, we do not even understand how they could have been altered; appellant does not explain how any alteration could have been accomplished or provide any reason to think it had been.

Appellant similarly objects that the government did not definitively prove that the object depicted in the videos was the firearm the police seized on April 25 (which was the weapon the prosecution needed to prove he possessed), and not a different but similar firearm, a replica, or a toy. (This contention overlaps with appellant's claim that the Instagram evidence was not "direct and substantial" proof of the charged weapons offenses, and we discuss it further *infra*.) Appellant posits (again, without evidentiary support) that it is possible the videos were created long before they were sent to him in February, in which case it might be less likely that they depicted the same firearm the police recovered at appellant's home in April.[25]

The short answer to all these objections is that they go to the weight, but not the admissibility, of the evidence. These objections do not undermine the trial

---

[25] *But cf. Jones v. United States*, 127 A.3d 1173, 1186 (D.C. 2015) ("Given the likelihood that the gun previously seen in appellant's possession was of the same distinctive type used in the charged offenses, it was less concerning that the prior sightings may have occurred several months, or even a year, before the charged offenses.").

judge's determination that the videos were sufficiently authenticated to allow the jury to consider whether they supported the possession charges against appellant.

## B. "Direct and Substantial Proof"

That brings us to appellant's contention that the trial court abused its discretion by admitting the Instagram evidence as direct proof of the charged crimes. Appellant argues that the Instagram evidence was not direct proof but rather "other crimes" evidence — what is commonly referred to as "*Drew* evidence." Appellant asserts that the government offered this evidence (improperly and prejudicially) for the sole purpose of proving his propensity to commit the charged offenses, and that it was properly admissible only on conditions not satisfied in this case.[26] We reject appellant's contention (as did the trial court) because we conclude that the Instagram evidence was indeed admissible as direct and substantial proof of the crimes

---

[26] *See Drew v. United States*, 331 F.2d 85, 89-90 (D.C. Cir. 1964). "Under *Drew*, evidence of other crimes committed by a defendant is admissible only if it is offered to prove a legitimate and materially disputed issue, such as motive, intent, common plan, identity, or absence of mistake or accident, and only if the trial judge finds by clear and convincing evidence that the defendant committed the other crimes, and determines that the probative value of the evidence is not substantially outweighed by the risk of unfair prejudice posed by its admission." *Jones*, 127 A.3d at 1184 (citations omitted).

charged, and appellant has not shown that the prosecution utilized the evidence improperly to prove his criminal disposition or that the jury might have done so.

The "strictures of *Drew*" do not apply to evidence of a defendant's uncharged criminal conduct that is "direct and substantial proof of the charged crime."[27] This court repeatedly has held "that evidence of a defendant's prior possession of the weapon or type of weapon used to commit a charged offense can be admitted as direct and substantial proof of the crime charged"[28] so long as the weapon "is linked to both the defendant and the crime and the connection is not too remote or conjectural."[29] Accordingly, admissibility typically "turns on a consideration of the temporal proximity of the incidents of prior possession to the charged offense and a comparison of the appearance of the weapon previously possessed by the defendant with that of the weapon actually used in the charged offense."[30] These principles apply not only to weapon possession; they apply to evidence of the defendant's prior

---

[27] *Jones*, 127 A.3d at 1184 (quoting *Johnson v. United States*, 683 A.2d 1087, 1098 (D.C. 1996) (en banc)).

[28] *Id.*

[29] *Ruffin v. United States*, 219 A.3d 997, 1009 (D.C. 2019) (internal quotation marks omitted) (quoting *King v. United States*, 618 A.2d 727, 728-29 (D.C. 1993)).

[30] *Jones*, 127 A.3d at 1185.

possession of other instrumentalities as well. In general, "[a]n accused person's prior possession of the physical means of committing the crime is some evidence of the probability of his guilt, and is therefore admissible."[31]

"A trial judge has broad discretion to determine the admissibility of evidence of uncharged misconduct as direct and substantial proof of the crime charged under *Johnson*, and on appeal our review of a judge's ruling admitting such evidence is limited to a consideration of whether there has been an abuse of discretion."[32] We find no abuse of discretion in the judge's decision to admit the Instagram evidence as direct and substantial proof of the charges in this case.

Appellant was charged with possessing the .40-caliber M&P Smith & Wesson handgun bearing a distinctive red laser sight and a large capacity ammunition feeder that police found in his bedroom on April 25, 2018. Appellant denied possessing either item on that date; probative evidence showing his recent prior possession of those items would constitute direct and substantial proof of the charges and rebut appellant's denial. The judge reasonably found that the records of appellant's

---

[31] *Ruffin*, 219 A.3d at 1009 (quoting *Coleman v. United States*, 379 A.2d 710, 712 (D.C. 1977)).

[32] *Jones*, 127 A.3d at 1185 (citing *Busey v. United States*, 747 A.2d 1153, 1165 (D.C. 2000)).

Instagram account supplied such evidence. The video clips, posted only two months earlier, showed appellant in physical possession of what appeared to be a matching handgun with the same distinctive red laser sight. While the records did not disclose when the video clips were recorded, both the judge and the jury (who could compare appellant's appearance in the clips to his appearance at trial) reasonably could find it most likely that the clips were recorded more or less contemporaneously with their posting, and not long in the past.[33] The April 17 direct share exchange included a message, evidently from appellant for the reasons already explained, claiming possession of a large capacity ammunition feeder for that same make and model of handgun — an admission, we note, that implied appellant's likely possession at that time of the handgun as well as the feeder. It is true that the evidence established "only a reasonable probability, and not a certainty,"[34] that appellant had recently possessed the gun and magazine that he was charged with possessing on April 25, but that was sufficient; the linkage was not conjectural or remote, "so the lack of *certainty goes to the weight of the evidence, not its admissibility."*[35]

---

[33] *Cf. United States v. Bowens*, 938 F.3d 790, 794 (6th Cir. 2019); *United States v. Vázquez-Soto*, 939 F.3d 365, 375 (1st Cir. 2019).

[34] *Busey*, 747 A.2d at 1165.

[35] *Id.*

Appellant argues that even if the Instagram evidence was relevant and otherwise admissible, "[t]he prejudice of admitting such sensational videos and messages greatly outweighed any conceivable probative value" because "jurors were exposed to videos in which appellant was purportedly pointing and waving a gun around and two others in the video were doing the same." This argument lacks merit. As we concluded in *Stewart*, "[a]ppellant overreaches when he argues that juries are so inflamed by the sight of a gun that they will simply disregard the court's instructions to decide the case without prejudice and to base their verdict solely on the evidence."[36] The Instagram videos were particularly probative of the disputed question of appellant's possession of the handgun and magazine on April 25, and there is no indication in the record that they were inflammatory or otherwise unfairly prejudicial.

Finally, the government did not urge the jury to draw an adverse propensity inference from the Instagram evidence. At appellant's request, as we discuss *infra*, the trial judge instructed the jury not to use the Instagram evidence "to conclude that [appellant] has a bad character or is likely to commit crimes." We conclude that the record does not support appellant's objections to the admission of the Instagram

---

[36] *Stewart v. United States*, 881 A.2d 1100, 1112 (D.C. 2005).

evidence under *Drew* or any concern that the jury treated the Instagram evidence as proof of appellant's criminal disposition.

### III. Sufficiency of the Evidence

Appellant argues that the evidence presented by the prosecution at trial was not sufficient to prove beyond a reasonable doubt that he possessed the .40-caliber M&P Smith & Wesson handgun and the associated 30-capacity extended magazine and .40-caliber ammunition.[37]  In evaluating this claim, we must view the evidence "in the light most favorable to the government, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact."[38]  We must deem the proof of guilt sufficient if "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."[39]

---

[37] The jury did not convict appellant of possessing the 15-capacity magazine or the 9-mm ammunition.

[38] *Moore v. United States*, 927 A.2d 1040, 1049 (D.C. 2007) (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C. 1987)).

[39] *Id.* (quoting *Rivas v. United States*, 783 A.2d 125, 134 (D.C. 2001) (en banc)).

Since the Smith & Wesson handgun and its accoutrements were found on the floor next to appellant rather than in his hands or on his physical person, the issue is whether the government proved his constructive possession of the items. "To prove constructive possession of . . . weapons, or other contraband, the evidence must show that the accused knew of its presence and had both the ability and [the] intent to exercise dominion and control over it."[40] When illicit items have been discovered in the accused's own home, a jury usually may infer that the accused had the requisite knowledge, dominion and control of them.[41] Even when the accused shared the premises with others, "additional probative evidence may suffice" to establish constructive possession by the accused,[42] as where the contraband was found in plain view, in the defendant's own bedroom or other personal space, or "in proximity to the defendant's personal items such as mail or personal papers, photographs, and identification cards."[43]

---

[40] *Id.* at 1050 (citing *Rivas*, 783 A.2d at 129).

[41] *Id.*

[42] *Id.*

[43] *Evans v. United States*, 122 A.3d 876, 890-91 (D.C. 2015) (quoting *Schools v. United States*, 84 A.3d 503, 510 (D.C. 2013)).

Such additional probative evidence was adduced in the present case. The police found the handgun, its extended magazine, and its ammunition in appellant's bedroom, where they also found appellant's personal papers and effects, and appellant himself asleep on the floor next to the gun.[44] The handgun was in plain view, within close reach of appellant, and additional ammunition for it was in the top drawer of appellant's bedroom dresser and under his bed. His former girlfriend, the only other person in the room, testified that the gun was not hers.[45] Moreover, the evidence from appellant's Instagram account included the video footage showing appellant waving a weapon that looked like the one in appellant's bedroom, and an admission reasonably attributable to appellant that he possessed the large capacity magazine attached to that weapon.

We conclude that the evidence adduced at trial was sufficient to permit the jury to find appellant guilty beyond a reasonable doubt of possessing the .40-caliber Smith & Wesson handgun and ammunition, along with the large capacity

---

[44] That this room was appellant's bedroom was confirmed at trial by his former girlfriend and his sister.

[45] Although appellant's sister claimed that the handgun belonged to her and that she had placed it on the floor next to appellant while he was asleep, the jury was free to disbelieve that testimony.

ammunition feeder attached to the gun, recovered from his bedroom on April 25, 2018.

## IV. Jury Instructions

Appellant argues that the trial court erred in responding to the deliberating jury's request for legal guidance and in later giving the jury an anti-deadlock instruction. We conclude that neither contention entitles appellant to relief.

## A. The Supplemental Instructions in Response to Notes from the Jury

The jury began its deliberations on the morning of August 28, 2018. On the following morning, one of the jurors became unavailable. The court empaneled one of the alternate jurors and instructed the jury to begin its deliberations afresh. At 12:50 p.m., after the jury had deliberated for approximately an hour and a half, it sent a note saying: "What do we do if we cannot agree? We are at an impass[e]." Appellant moved for a mistrial, which the court denied. The court instead instructed the jury to continue deliberating.

At 4:10 that afternoon, the jury sent another note, which asked, in relevant part: "Is . . . the possession we are to determine exclusively limited to the time of the

search warrant? Can possession be established at any time? Can past possession of an item be used to infer subsequent possession?" The court conferred with the parties as to how to respond to this note. As to the first two questions, they agreed that the question for the jury was limited to whether appellant possessed the handgun, magazines, and ammunition at the time the police executed the search warrant at appellant's apartment. Regarding whether past possession could be used to infer subsequent possession, the judge indicated his inclination to tell the jury: "[Y]ou can but need not infer possession on or about the date of the charged offense, April 25th, 2018, based on possession at an earlier time." "That was the whole reason," the judge said, "why the Instagram evidence was relevant in the first instance. It's not for propensity. It's to show . . . possession." Appellant's counsel requested that the court include an admonition to the jury not to use his past firearm possession as propensity evidence, and the judge agreed to incorporate that in the supplemental instructions he would prepare and share with counsel that evening.

The next morning, the judge reviewed his proposed response to the jury's note with the parties. The proposed response stated that each charge required the government to prove possession by appellant "on or about April 25, 2018," and that the jury "cannot find Mr. Johnson guilty of a charged offense based on possession at some other time." Referring to the Instagram video clips, the proposed response

stated that "[t]he government has presented evidence that the government contends shows Mr. Johnson with the firearm at issue in Count [One] at some point prior to April 25, 2018." If the jury were to so find, the proposed response said, it could use that evidence "only for the limited purpose of deciding whether the government . . . proved beyond a reasonable doubt that Mr. Johnson possessed the firearm, ammunition, and large-capacity feeding devices" at issue on or about April 25, 2018.

Granting appellant's request for a limiting instruction against drawing adverse propensity inferences, the judge next included the following passage:

> Mr. Johnson is only on trial for the crimes charged. He is not charged in this case with any offense relating to possession of firearms or ammunition at any other time, and you may not use this evidence [of previous possession] to conclude that he has a bad character or is likely to commit crimes. The law does not allow you to convict Mr. Johnson simply because you believe he may have done other things not specifically charged as crimes in this case at other times.

The government asked the court to delete this passage, but the judge declined to do so, saying it was "important limiting language to make sure that the jury does not misuse the video evidence." The judge noted that the language tracked "very closely" the standard pattern jury instruction on "other bad acts."

The government also asked the court to include "the standard instruction on the definition of 'on or about.'"[46]  Appellant objected to including this definition. He argued that there was no reason to give the instruction because there was no dispute or uncertainty as to the exact date of the charged offenses — it was April 25, 2018, the date on which the police executed the warrant to search appellant's apartment and found him there with the handgun, ammunition, and large capacity ammunition feeding devices.  And giving the requested "on or about" instruction would "confuse the issue," appellant pointed out, because it might be understood to allow the jury to convict him based on his possession of the gun shown in the Instagram video clips sent in February 2018.  Citing case law and the comment to Criminal Jury Instruction 3.103, appellant argued that where the prosecution has been permitted to introduce evidence of prior bad acts in its proof of the charged

---

[46] Specifically, the government requested that the court include language from Instruction 3.103 of the Criminal Jury Instructions for the District of Columbia (5th ed.) so as to read as follows:

> The indictment charges that the offenses in this case were committed "on or about" April 25, 2018.  The proof need not establish with certainty the exact date of the alleged offense.  It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

offense, it is error to give an "on or about" instruction if it might lead the jury to convict on the basis of those prior acts alone.[47]

The court overruled the objection and granted the government's request. It explained that defining "on or about" answered the jury's question as to the relevant time period, which the indictment stated was "on or about" April 25, 2018. As to appellant's concern that "on or about" might mislead the jury into convicting appellant on the basis of his possession shown in the video clips, the court reasoned that its limiting instructions ensured against that possibility.

With that issue resolved, the jury was called back into the courtroom to hear the court's supplemental instructions in response to their note.[48]

---

[47] *See United States v. Thomas*, 459 F.2d 1172, 1177 (D.C. Cir. 1972).

[48] The court instructed the jury as follows:

> The government has the burden of proving beyond a reasonable doubt every element of the offenses with which Mr. Johnson is charged. Each of the charged offenses is alleged to have occurred on or about April 25th, 2018, and possession is an element of each charged offense. Accordingly, to find Mr. Johnson guilty of a charged offense, the government must prove beyond a reasonable doubt that he possessed the item that is the subject of that offense on or about April 25th, 2018. You cannot find Mr. Johnson guilty of a charged offense based on his possession at some other time. The proof need not

The jury then resumed its deliberations at 10:34 a.m. At 11:45 a.m., it sent a note stating: "Having discussed at length, we do not believe we will ever be able to come to a unanimous decision. We do not see the point in continuing deliberation. Please advise." The government requested the court to give the *Winters*[49] anti-

establish with certainty the exact date of the alleged offense. It is sufficient if the evidence in the case establishes beyond a reasonable doubt that the offense was committed on a date reasonably near the date alleged.

The government has presented evidence that the government contends shows Mr. Johnson with the firearm at issue in Count 1 at some point prior to April 25th, 2018. It is up to you to decide whether to accept that evidence. If you find that Mr. Johnson possessed the firearm at issue in Count 1 at an earlier time, you may use this evidence only for the limited purpose of deciding whether the government has proved beyond a reasonable doubt that Mr. Johnson possessed the firearm, ammunition, and large-capacity feeding devices that are the subjects of Counts 1 through 6 on or about April 25th of 2018. You may not use this evidence for any other purpose. Mr. Johnson is only on trial for the crimes charged. He is not charged in this case with any offense relating to possession of firearms or ammunition at any other time, and you may not use this evidence to conclude that he has a bad character or is likely to commit crimes. The law does not allow you to convict Mr. Johnson simply because you believe he may have done other things not specifically charged as crimes in this case at other times.

[49] *Winters v. United States*, 317 A.2d 530, 533 (D.C. 1974) (en banc) (approving instruction designed to "stimulat[e] a decision in the face of deadlock" while "preserving juror independence").

deadlock instruction, while appellant moved for a mistrial. The judge observed that the jury had been deliberating for only about an hour after receiving the supplemental instructions in response to their questions, and that "this was not a simple answer to a simple question." Stating that he "believe[d] the jury ha[d] not completed its work and that they could perhaps benefit from additional deliberation," the judge decided to give the *Winters* instruction.

Following that instruction, at 12:21 p.m., the jury returned to its deliberations. At 12:55 p.m., it reported that it had reached verdicts on all counts. The jury returned to the courtroom, rendered its verdicts, was polled without incident, and was found to be unanimous.

## B. The "On or About" Instruction

Appellant argues that the trial court erred by instructing the jury in accordance with Criminal Jury Instruction 3.103 that the government did not have to prove the "exact date" of the alleged offenses, but only that the offenses were committed on a date reasonably near the date alleged in the indictment. We are persuaded that it was

a mistake to include this instruction, but we are satisfied that the error did not mislead the jury or prejudice appellant.[50] It therefore does not entitle appellant to relief.

The "decision on what further instructions, if any, to give in response to a jury question lies within the sound discretion of the trial court."[51] "Nevertheless, '[w]here a jury has demonstrated confusion, . . . the trial judge may not allow that confusion to continue, but must make an appropriate and effective response.'"[52]

Because the indictment alleged that the charged offenses were committed "on or about" April 25, 2018, it is understandable that the judge felt obliged in this case to grant the government's request for Instruction 3.103. But at trial there was no question regarding the exact and only date on which the government sought to prove appellant committed those offenses. It was the date the police searched his

_____

[50] *See Johnson v. United States*, 398 A.2d 354, 367 (D.C. 1979) ("[T]he appellate court makes two distinct classes of inquiries when reviewing a trial court's exercise of discretion. It must determine, first, whether the exercise of discretion was in error and, if so, whether the impact of that error requires reversal. It is when both these inquiries are answered in the affirmative that we hold that the trial court 'abused' its discretion.").

[51] *Colbert v. United States*, 125 A.3d 326, 334 (D.C. 2015) (quoting *Yelverton v. United States*, 904 A.2d 383, 387 (D.C. 2006)).

[52] *Id*. (alteration in original) (quoting *Whitaker v. United States*, 617 A.2d 499, 501 (D.C. 1992)).

apartment, and that was indisputably "on" April 25 and not any date "about" it. While the government introduced Instagram records evidencing appellant's earlier possession of the handgun and an extended magazine, it did so only for the limited purpose of proving his possession at the time of the search; the government expressly disavowed prosecuting appellant for his possession at any time prior to April 25.

Under these circumstances, the "on or about" instruction was inappropriate; it was unhelpful to the jury and served no useful purpose, and it had the potential to lead the jury to convict appellant improperly for previous possession indicated by the Instagram evidence. As the comment to Instruction 3.103 explains,

> This instruction should be given where an issue of fact as to the date of the offense is presented by the evidence, or where there is a variance between the date alleged in the information or indictment and the date proved by the evidence. Generally, there is little purpose in giving this instruction when the government's proof has focused on a specific date, or specific dates for multiple offenses. . . . [N]ormally the giving of the instruction under such circumstances would be harmless error since there is little likelihood that the jury will speculate that the offense or offenses occurred on a different date or dates. *But see U[nited] S[tates] v. Thomas*, 459 F.2d 1172, 1177 (D.C. Cir. 1972) (where government permitted to introduce evidence of prior acts of cruelty to support case on charged offense, it was error to give "on or about" instruction

which might have permitted jury to convict on basis of prior acts).[53]

Although it was a mistake to give the "on or about" instruction, we do not evaluate it in a vacuum, ignoring what else the court told the jury at the same time. The rest of the supplemental instruction dispelled the risk that the jury would convict appellant for possession prior to April 25 (which was the reason the judge himself gave for overruling appellant's objection to Instruction 3.103). The judge emphatically told the jury that it could use the evidence that appellant possessed the firearm "at some point prior to April 25th, 2018," "only for the limited purpose of deciding whether . . . [appellant] possessed the firearm, ammunition, and large-capacity feeding devices that are the subjects of Counts 1 through 6 on or about April 25th of 2018," and not "for any other purpose." The judge reiterated that appellant was "not charged in this case with any offense relating to possession of firearms or ammunition at any other time," and that the law did not allow the jury to convict him for possession "at other times." The jurors could only have understood these admonitions as meaning they could not find appellant guilty for any prior possession

---

[53] Criminal Jury Instructions for the District of Columbia, No. 3.103, cmt. (5th ed. 2022) (citations omitted).

shown or implied by the Instagram evidence (which was the only evidence of prior possession presented by the prosecution).[54]

We think the verdict itself provides some additional assurance that the jurors complied with this limitation and convicted appellant based on what they found he possessed on April 25. One of the counts on which the jurors convicted appellant charged him with possession of .40-caliber ammunition. The only evidence at trial that he possessed such ammunition was what the police found in his bedroom on April 25; the Instagram records contained no evidence that he possessed ammunition

---

[54] Appellant objects that the supplemental instruction did not specifically caution the jury against convicting him for possessing a large capacity ammunition feeding device a week before the police searched his bedroom, based on the April 17 Instagram message in which he admitted possessing the device shown in a photograph. Appellant did not object at trial to this omission from the supplemental instruction, and appellant has failed to demonstrate that it amounted to plain error. *See Rogers v. United States*, 222 A.3d 1046, 1050 (D.C. 2019). The supplemental instruction may not have been letter-perfect, but we are confident it correctly conveyed what was necessary.

Appellant also objects to the statement in the supplemental instruction that proof of appellant's earlier possession of the firearm seized by the police on April 25 could be probative of his possession of the ammunition and large capacity feeding devices also seized at that time. This, too, was not an objection he raised at trial. We do not deem the statement erroneous, let alone plainly so. Evidence that a defendant possessed a firearm at a given time and place makes it at least slightly more probable that he also possessed the ammunition and feeding devices that were compatible with the firearm and that were found with it at same time and place.

at any other time. So we think it a fair inference that the jury found that appellant possessed the .40-caliber ammunition found in his bedroom on April 25.[55] If the jury so found, it is difficult to fathom why they would not also have found he possessed the .40-caliber firearm and its extended magazine that the police also found in his bedroom during the same search (particularly since much of the .40-caliber ammunition was recovered from that firearm and magazine).

We conclude that the supplemental instruction as a whole mitigated the "on or about" mistake and effectively advised the jury that the government had to prove appellant possessed the contraband that the police found in his bedroom on April 25, 2018. We therefore are satisfied that the trial court did not abuse its discretion, and that the instructional "error was sufficiently insignificant to give us fair assurance that the judgment was not substantially swayed by it."[56]

---

[55] We do not think this inference is inconsistent with the jury's acquittal of appellant on the charges that he possessed the 9-mm ammunition and the 15-round capacity magazine also found in his bedroom on April 25. Unlike the other contraband, the 9-mm ammunition and 15-round capacity magazine were not out in the open and plainly visible to appellant; they were secreted under appellant's bed and could not be seen until the police lifted the bed up. Appellant's sister had claimed those items as hers, and the government presented no evidence specifically linking them to appellant.

[56] *Brooks v. United States*, 599 A.2d 1094, 1101-02 (D.C. 1991) (explaining that "instructional error is subject to harmless error analysis"). We apply the test of harmlessness applicable to non-constitutional error, considering that the "on or

## C. The *Winters* Anti-Deadlock Instruction

Appellant contends the court committed reversible error by giving the *Winters* anti-deadlock instruction, over his objection, after the jury had deliberated approximately five and a half hours and twice declared itself at an impasse. He contends the instruction's coerciveness was shown by "the speedy shift" to a guilty verdict it produced just 34 minutes after the court delivered it.

Whether to give an anti-deadlock instruction when a jury reports itself at an impasse, and which approved instruction to give, are questions committed to the discretion of the trial judge.[57] "It is, of course, an abuse of that discretion to give an anti-deadlock instruction under circumstances creating a substantial risk of juror coercion."[58] We evaluate that risk by assessing "the inherent coercive potential of the situation before the court" and examining whether the actions of the trial judge

---

about" instruction did not unconstitutionally authorize the jury to convict appellant of an offense with which he was not charged in the indictment, or based on evidence obtained in violation of the Constitution.

[57] *Jones v. United States*, 999 A.2d 917, 924-25 (D.C. 2010); *see also Epperson v. United States*, 495 A.2d 1170, 1173 (D.C. 1985).

[58] *Hankins v. United States*, 3 A.3d 356, 361 (D.C. 2010).

"exacerbated, alleviated or were neutral with respect to coercive potential."[59] We have distilled from our cases the following pertinent principles guiding the determination of whether an anti-deadlock instruction resulted in a substantial risk of coercion:

> We examine the question of coercion from the jurors' perspective. Coercion of a verdict does not mean simple pressure to agree. Rather, pressure to agree is impermissibly coercive when it is likely to force a juror to abandon his or her honest conviction as a pure accommodation to the majority of jurors or the court. The question is one of probabilities, not certainties; from our review of the record, we must be able to say with assurance that the jury arrived at its verdict freely and fairly.
>
> As a rule, it is not coercive to give a standard anti-deadlock instruction when a jury has declared itself unable to agree after having deliberated for a considerable length of time. Typically, where the jury's numerical division and leaning have not been disclosed and no juror has been singled out, no members of the jury have any reason to suppose the anti-deadlock instruction is aimed at them (or at their position). As a result, no juror would have a reason to feel forced to abandon his or her conviction.[60]

We do not perceive a significant degree of coercive potential in the record before us in this case. The jury's initial impasse note was received by the trial court

---

[59] *Harris v. United States*, 622 A.2d 697, 701 (D.C. 1993).

[60] *Hankins*, 3 A.3d at 361-62 (internal quotation marks, alterations, and citations omitted).

about an hour and half after the renewed commencement of deliberations. In response, the judge merely asked the jury to continue deliberating, and the jury did so. There is no claim that this directive was coercive or inappropriate, and we do not think it was. After a few hours, the jury submitted substantive questions to the court. The court's response to those questions helped to focus the inquiry for the jurors and gave them things to chew over and digest. The jury deliberated only about an hour after receiving the court's response before it again reported being deadlocked. Thus, as of that time, the deliberations had not been unduly lengthy, the jury had not disclosed a numerical split or a prior verdict, no dissenting juror had been singled out, there was no indication of destructive acrimony among the jurors, and no juror claimed to be under external pressure to conclude or be released from the deliberations.

In those circumstances, the judge reasonably could believe that, with proper encouragement and guidance from the court in the form of a non-coercive anti-deadlock instruction, the jury might work productively through its impasse.[61] And

---

[61] That the jury had twice declared itself unable to reach a verdict did not require the judge to declare a mistrial in lieu of giving an anti-deadlock instruction. It would have been premature for the judge to have given an anti-deadlock instruction after only the first note expressing the jury's inability to reach a verdict. The judge was obliged to determine that the jury was truly at an impasse — here, by waiting until after the second note — before giving an anti-deadlock instruction.

the *Winters* instruction the judge chose to give neutrally asked all the jurors — both those for acquittal and those for conviction —— to "listen to each other's arguments with a willingness to be convinced," and to decide the case if they could "conscientiously do so." In giving that instruction, the judge did not act precipitously or impatiently, and he did not tell the jurors they had to reach a verdict or suggest what verdict they ought to reach. It is true that our cases have acknowledged "the coercive potential of the [*Winters*] instruction's rather emphatic language; we have deemed it to represent the 'highwater mark' of an anti-deadlock instruction because of the 'sting' it carries in favor of a verdict."[62] But this in itself is not enough to render the *Winters* instruction substantially coercive, and our cases have approved its use repeatedly, including in circumstances comparable to those present here. We do not see that the judge's actions in giving the *Winters* instruction can be said to have contributed to a coercive atmosphere or to have caused any juror to "abandon his honest conviction as a pure accommodation to the majority of jurors or the court."[63]

---

*See, e.g.*, *Epperson*, 495 A.2d at 1172; *Reed v. United States*, 383 A.2d 316, 322 (D.C. 1978).

[62] *Hankins*, 3 A.3d at 360 n.3 (quoting *Jones v. United States*, 946 A.2d 970, 975 (D.C. 2008) (quoting *Winters*, 317 A.2d at 533, 534)).

[63] *Winters*, 317 A.2d at 532. It is worth noting that the jury's eventual verdict reflected an individualized and discriminating assessment of the evidence, in that the

Appellant's argument for the existence of coercion comes down to the simple fact that the jury agreed on its verdict only 34 minutes after receiving the *Winters* instruction. If half an hour seems relatively quick, that "may be some indication of the anti-deadlock instruction's effectiveness, but we do not think it implies coerciveness,"[64] particularly in light of the short total duration of the deliberations and the uncomplicated facts of the case. "Countering such an implication is the fact that no juror hesitated to assent to the verdict when the jury was polled."[65]

We conclude that the trial judge did not abuse his discretion in giving the jurors a *Winters* instruction.

---

jury found appellant guilty on four counts and not guilty on two of them. There was nothing irrational or inconsistent in that outcome.

[64] *Hankins*, 3 A.3d at 363 (holding that coercion was not shown where the jury reached a verdict an hour after the judge's anti-deadlock instruction); *see also Nixon v. United States*, 730 A.2d 145, 154-55 (D.C. 1999) (no coercion where jury reached its verdict about one hour after receiving the *Winters* instruction).

[65] *Hankins*, 3 A.3d at 364. "The purpose of the jury poll . . . 'is to ascertain for a certainty that each of the jurors approves of the verdict as returned; that no one has been coerced or induced to sign a verdict to which he does not fully assent.'" *Green v. United States*, 740 A.2d 21, 25 (D.C. 1999) (quoting *Humphries v. District of Columbia*, 174 U.S. 190, 194 (1899)).

## V. Conclusion

For the foregoing reasons, we affirm appellant's convictions.